BURKE, Judge.
Courtney Larrell Lockhart was convicted of murder made capital because it was committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. The jury unanimously recommended that Lockhart be sentenced to life in prison without the possibility of parole. However, the trial court did not follow the jury’s recommendation and sentenced Lockhart to death. Lockhart appeals his conviction and his sentence.

Facts

On March 4, 2008, passersby discovered Lauren Burk, a student at Auburn University, in distress on Highway 147 in Lee County. Burk was naked and had numerous abrasions on her body. She was also suffering from a single gunshot wound to her upper body. Shortly after Burk was discovered, she died from the gunshot wound.
On March 7, 2008, after being arrested by police officers in Phenix City, Lockhart was interviewed by law-enforcement officers from multiple agencies, including the Phenix City Police Department, the Auburn Police Department, and the Alabama Bureau of Investigations. After waiving his Miranda[1] rights, Lockhart gave the law-enforcement officers a detailed oral confession that was recorded on video and shown to the jury at trial. Lockhart also gave the law-enforcement officers a signed, handwritten statement, which stated:
“On Tuesday of March — I am not sure of the date, but I was in Auburn, Ala-bama, and I was on [Auburn University] campus and I rode around the Auburn/Opelika area all day, and that night, I saw my victim, Lauren, and I ran up to her while she was getting in the car and I pushed her in the car and told her to give me her money. And I got in the car with her and just talked to her. Then I drove her car off with her in it and was just riding, and I told her to take off her clothes and we kept riding. We were talking about how my life was over and how she could help me get a job and then after riding for about 80 minutes, we headed back to [Auburn University] campus, and on the way back we were still talking about my situation and how she could help me, and I was telling her that she couldn’t help and that this was the end for me. And the gun went off, and she jumped out of the car. And I went to turn around, and at the turnaround point, there was already another truck turning around, so I just went straight to campus, but I stopped and filled her car up with gas. On the way to campus, I hear people standing on the street saying somebody’s car is leaking gas, and I let the windows up and headed straight for campus. Set the car on fire. Left. Went to fuel my car up. Then went back to campus to make sure the car was burning. Saw that it was. Then headed to Atlanta. In addition to all of this, I threw her debit card out of the window on 1-85 South, and I left her car keys in the car, in the ignition, and I also left her phone in the car.”
(C. 986-87; R. 3891-94.)
On March 9, 2008, Lockhart was again interviewed by officers with the Auburn Police Department. Again, Lockhart was advised of his Miranda rights, and he waived those rights. After waiving his *1098 Miranda rights, Lockhart gave the law-enforcement officers another statement. In that statement, Lockhart gave more detail about what transpired before he approached Burk on the evening she died:
“My name is Courtney Larrell Lock-hart, arid I am 23 years old. I have read my rights and I understand them. This is a true and voluntary statement. I have been working for War Grading for a year this coming April. I was working at a job site on North Dean Road in Auburn. I have worked at that site for about a month. It’s between the' Vet’s: office and a graphics place. Some days I drive back and forth myself and some days we meet at the office in Smith’s, and I’ll drive the truck. This past Monday I spent the night in the parking lot of the hospital in Opelika. I didn’t think I had enough gas and I thought I. was working the next day, anyway. It started raining that night and I knew we would not work the next day. About midmorning or noon, I went riding around. I stopped at a gas station catty-cornered from Golden Corral. I stayed in the Opelika/Auburn area and on campus. I drove back to the hospital parking lot while it was still daylight. I stayed there until dusk. I went riding around again. I ended up back on campus. Everybody was out running earlier, and when I got back, only a couple were running. I rode around campus and stopped in a parking lot. It was on top of the hill. Straight in front was a fence. Facing ,the fence on the right was some stairs going down the hill. I backed in at the fence so nobody couldn’t see my tag. I could observe everything in front of me. I stayed there about two minutes. I moved to another spot. I saw a black female police officer drove by in a black and white. She parked and I moved because I was just sitting in the car. She did see me. I left also because I saw you had to have a parking permit to park there. I drove around, but I didn’t leave campus. This was when it was still daylight. I rode back by to see if the police officer was still there. The police officer was gone, and this was when it was still daylight. I then drove back to the hospital and parked. It was daylight when I parked. I sat there two or three hours before it got dusk. I parked where I could see the helopad in my rearview mirror. Right when it got dusk, I left and rode around to campus. Everybody was outside. I rode around campus for about an hour. I parked in the same parking lot as before and was talking on the phone. I parked there for awhile. I see Lauren getting into her car. She’s already got her door open. She is doing it so slow. I get out of my car and walked over to her, behind her. When I saw Lauren, I hung up the phone, grabbed my gun, and came up behind her. I told her to get ‘the fuck in the car.’ I asked her how much money do you have. She didn’t say anything. She was still screaming. I was sitting in the driver’s seat, and she was in the passenger’s seat. I was just sitting there, and she finally calmed herself down.”
(C. 994-97; R. 3934-40.)
When Lockhart was arrested, an iPod portable media device belonging to Burk was in his possession. (R. 3802-03, 3841.) When police officers searched Lockhart’s car after his arrest, they discovered three spent .38-special shell casings and a green T-shirt inside the car. (R. 3764-65, 3768.) Law-enforcement officers also discovered a fired lead bullet in the burned remains of Burk’s vehicle. (R. 3620, 3626-27, 3634.) When Lockhart was interviewed by the police shortly after he was arrested, he informed the police officers that he had *1099 thrown a handgun out of his car window as he passed by the Publix supermarket on Summerville Road in Phenix City. (R. 3872-77.) Police officers searched the area around that Publix supermarket and recovered a handgun. (R. 3814-30.) Katherine Richert, a forensic scientist specializing in firearms and toolmarks examination for the Alabama.Department of Forensic Sciences, testified that the handgun recovered from the area around the Publix supermarket had fired the bullet found in Burk’s car and the shell casings found in Lockhart’s car. (R. 4040-41, 4048.) Ric-hert also testified that that gun functioned properly and that it required approximately five pounds of pressure to pull the trigger to the rear when the hammer was cocked. (R. 4042-45.) She further testified that the gun required approximately 12 pounds of pressure to pull the trigger to the rear when the hammer was not cocked. (R. 4045.) Kristin Maturi, a forensic DNA analyst with the Alabama Department of Forensic Sciences, testified that Burk’s DNA profile and Lockhart’s DNA profile matched DNA profiles obtained from the green T-shirt that was found inside Lock-hart’s car after he was arrested. (R. 4106-10.)
Dr. John Daniels, a former medical examiner for the State of Alabama, performed the autopsy on Burk’s body. Dr. Daniels testified that the cause of Burk’s death was a single gunshot that entered her upper left back and exited through her right upper arm. (R. 3501.) Dr. Daniels testified that, based on the entrance wound, the muzzle of the firearm was a few inches away from Burk’s skin when the fatal shot was fired. (R. 3507-08.)
At trial, it was undisputed that Lockhart caused Burk’s death. However, the defense contended that Lockhart did not intend to cause Burk’s death. Specifically, the defense argued that Lockhart accidentally fired the gunshot that killed Burk and that his prior military service caused him to suffer from a mental disease or defect that rendered him incapable of appreciating the nature and quality or the wrongfulness of his acts.

Discussion

In his brief to this Court, Lockhart raises several issues that were not first raised in the trial court; thus, those issues were not preserved for appellate review. Nevertheless, because Lockhart was sentenced to death, his failure to raise those issues in the trial court does not prevent this Court from reviewing those issues for plain error.
Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take-appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In Wilson v. State, 142 So.3d 732, 751 (Ala.Crim.App.2010) (opinion on return to remand), this Court stated:
“ ‘[T]he plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice, would otherwise result.” ’ United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.’ Hall v. State, 820 So.2d 113, 121 (Ala. *1100 Crim.App.1999). Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error); Thomas v. State, 824 So.2d 1, 13 (Ala.Crim.App.1999) (recognizing that to rise to the level of plain error, an error must have affected the outcome of the trial), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004). That is, the appellant must establish that an alleged error, ‘“‘not only seriously affect[ed] [the appellant’s] “substantial rights,” but ... also ha[d] an unfair prejudicial impact on the jury’s deliberations.’ ” ’ Ex parte Brown, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). Only when an error is ‘so egregious ... that [it] seriously affects the fairness, integrity or public reputation of judicial proceedings,’ will reversal be appropriate under the plain-error doctrine. Ex parte Price, 725 So.2d 1063, 1071-72 (Ala.1998) (internal citations and quotations omitted). Although the ‘failure to object does not preclude [appellate] review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985) (citing Bush v. State, 431 So.2d 563, 565 (1983)) (emphasis in original). As the United States Supreme Court has noted, the appellant’s burden to establish that he is entitled to reversal based on an unpre-served error ‘is difficult, “as it should be.” ’ Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, m173 L.Ed.2d 266 (2009)" (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004)).”
I.
On appeal, Lockhart first argues that the trial court erroneously admitted the expert testimony of Dr. Glen King, a forensic psychologist. Specifically, Lockhart argues that Dr. King gave testimony that improperly went to the ultimate issue in the case; that Dr. King improperly gave testimony that constituted legal conclusions; and that Dr. King improperly gave testimony that was based on sources that were not admitted into evidence. Lock-hart failed to raise these arguments in the trial court; thus, they will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
A.
Lockhart argues that Dr. King gave testimony that improperly went -to the ultimate issue in the case. Specifically, Lockhart argues that Dr. King gave improper testimony concerning whether Lockhart possessed the requisite intent to cause Burk’s death at the time of the offense. Lockhart bases this argument on the following testimony:
“[Prosecutor]: At the time of the killing of Lauren Burk back on March 4th of 2008 was the defendant, Courtney Lockhart, suffering from any kind of mental disease or defect in your professional opinion?
“[Dr. King]: Absolutely not.
“[Prosecutor]: Okay. And could he understand the nature and quality of his acts?
“[Dr. King]: Yes.
“[Prosecutor]: And could he understand the wrongfulness of his acts?
“[Dr. King]: Absolutely he could.
*1101 “[Prosecutor]: And how did you determine that, Dr. King?
“[Dr. King]: One of the things I really rely on for a mental state at the time of the offense are any information or records that I have about the behavior of the perpetrator at the time of the offense. In this particular case, Mr. Lock-hart engaged in a series of premeditated actions over a lengthy period of time that were all goal directed towards the abduction and murder of the victim, Lauren Burk. He cased the place where he was going to do this. He backed his car up so that nobody could observe his license tag. He noticed when he first arrived there that there was a police officer in a black and white, so he left the — the area and then returned later. He then abducted the victim, shot her, ■and when he returned, he tried to destroy evidence by burning her car, and then he fled the scene by leaving to go to Atlanta. All of that says to me that the behaviors were, again, premeditated, planned, organized, and that he had a definite motive to avoid apprehension and detection.”
(R. 4217-18.)
Rule 704, Ala. R. Evid., provides: “Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” ‘“An ultimate issue has been defined as the last question that must be determined by the jury.’ ” Fitch v. State, 851 So.2d 103, 116 (Ala.Crim.App.2001) (quoting Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997)). In Fitch, this Court recognized that when the testimony at issue is given by an expert, Rule 704 must be read in conjunction with Rule 702(a), Ala. R. Evid., which provides: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.” See Fitch, 851 So.2d at 117.
In Fitch, this Court also noted:
“This Court has said:
“‘Rule 704, Ala. R. Evid., provides .that “[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” However, in the case of expert testimony, enforcement of this rule has been lax. C. Gamble, Gamble’s Alabama Rules of Evidence § 704 (1995). We have noted previously in Travis v. State, 776 So.2d 819 at 849 (Ala.Cr.App.1997), that expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact, and the fact that “ ‘ “a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper” ’ ” (citations omitted); see also Rule 702, Ala. R. Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact).’
“Henderson v. State, 715 So.2d 863, 864-65 (Ala.Crim.App.1997).”
Fitch, 851.So.2d at 117.
Furthermore, this Court recently held that “an expert may testify as to mental deficiency or illness in Alabama as an exception to the ultimate issue rule.” Smith v. State, 112 So.3d 1108, 1134 (Ala.Crim.App.2012) (citing §§ 127.02(1) and 128.04, C. Gamble, McElroy’s Alabama Evidence (6th ed.2009)). Specifically, this Court stated:
“There is no violation of the prohibition against testimony concerning the ulti *1102 mate issue where a physician testifies concerning his opinion as to a diagnosis, including a mental diagnosis. ‘If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.’ Rule 702(a), Ala. R. Evid. See J. Colquitt, Alabama Law of Evidence (1990) (noting that lay and expert opinion evidence is allowed on certain issues, including mental condition, regardless of whether such opinion evidence goes to an ultimate issue in a case).”
Smith, 112 So.3d at 1134.
In the present case, the ultimate issue to be decided by the jury was whether Lock-hart intended to cause Burk’s death, as required by the definition of murder found in § 13A-6-2(a)(1), Ala.Code 1975. Dr. King never testified that Lockhart intended to cause Burk’s death. Instead, Dr. King testified that, in his professional opinion, based on Lockhart’s actions, Lock-hart was not suffering from a mental disease or defect and could understand the nature and quality and the wrongfulness of his acts on March 4, 2008. Dr. King explained that, in his expert opinion, on March 4, 2008, Lockhart was not suffering from a mental disease or defect because he engaged in a series of premeditated, organized, and goal-oriented actions. Certainly, that expert testimony would aid or assist the jury in determining a fact at issue, i.e., whether Lockhart was suffering from a mental disease or defect that would render him unable to appreciate the nature and quality or the wrongfulness of his acts at the time he caused Burk’s death.
Dr. King did not testify that Lockhart possessed the requisite intent at the time of the crime; however, Dr. King did state that, in his expert opinion, Lockhart did not suffer from a mental disease or defect at the time of the crime, and Dr. King stated the facts upon which he reached that opinion. The jury could then, in turn, properly use that information to determine whether Lockhart possessed the requisite intent at the time of the crime. Reading Rule 704 in conjunction with Rule 702(a) and considering the recognized exception to the ultimate-issue rule, when an expert testifies as to mental illness, we find that the admission of Dr. King’s testimony was not an obvious and indisputable error; thus, the trial court’s failure to exclude Dr. King’s testimony based on the ultimate-issue rule did not constitute plain error.
B.
Similarly, Lockhart contends that Dr. King improperly gave testimony that constituted a legal conclusion and, thus, invaded the province of the jury. Lock-hart bases this contention on the following portion of Dr. King’s testimony:.
“[Prosecutor]: The defense of insanity is what?
“[Dr. King]: The defense of insanity requires that an individual have a serious mental illness or mental defect that then results in their ability — their inability to understand the nature and quality of their actions or the wrongfulness of their acts. Just, having a mental illness, even if someone does have a mental illness, does not equate to insanity in a legal sense. There has to be that requirement of having a serious mental illness and not being able to understand what you are doing is right or wrong at the time of the offense.
“[Prosecutor]: And your opinion is that the Defendant has no mental disease or defect?
“[Dr. King]: That’s correct.
*1103 “[Prosecutor]: And does not meet that criteria?
“[Dr. King]: He has never had any treatment for it. He has never taken any medications for treatment of mental illness. He has never been hospitalized for mental illness. He has never sought nor received consultation about mental illness. I didn’t see any symptoms of any mental illness in him. And I believe their expert didn’t either.”
(R. 4227-28.)
To support his argument on appeal, Lockhart relies on Harris v. State, 39 Ala.App. 139, 99 So.2d 201 (1957). In Harris, the defendant pleaded not guilty by reason of insanity. At trial, interrogatories propounded to a psychiatrist, with the answers thereto, were received into evidence. In the psychiatrist’s answers to interrogatories concerning whether the defendant could control his behavior, the psychiatrist stated that, “from a legal standpoint we would consider [the defendant] competent, sane and responsible for his behavior” and that “in a legal sense, not being insane, I would consider [the defendant] mentally competent and theoretically able to control his behavior.” Harris, 39 Ala.App. at 141, 99 So.2d at 203. The appellate court held that that testimony was improper because it invaded the province of the jury.
In more recent cases, this Court has stated:
“1 “ ‘Opinions of experts in the field of mental disorders as to an accused’s sanity or insanity are of course admissible and certainly should be carefully considered by a jury. Such opinion evidence is not, however, conclusive on the jury. The responsibility is upon the jury to weigh all the evidence, expert and lay, pertaining to the issue of the accused’s mental competency. The weight to be accorded all such
evidence is solely within the jury’s province. They may reject it all even though it is without conflict.’
“ ‘ “Fitzhugh v. State, 35 Ala.App. 18, 26, 43 So.2d 831, 838, cert. denied, 253 Ala. 246, 43 So.2d 839 (1949), cert. denied, 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388 (1950). . . .
[[Image here]]
“‘Ellis v. State, 570 So.2d 744, 751-53 (Ala.Crim.App.1990).’ ”
Morris v. State, 60 So.3d 326, 345-46 (Ala.Crim.App.2010) (quoting Dunaway v. State, 746 So.2d 1021, 1033 (Ala.Crim.App.1998)).
In Asbill v. State, 390 So.2d 1168 (Ala.Crim.App.1980), this Court held that an expert witness’s testimony indicating that the expert would not keep the defendant at a mental hospital did not improperly poison the minds of the jury and that such testimony was merely “another way of stating that [the expert’s] opinion was that [the defendant] was sane at the time of the homicide and the trial.” Id. at 1172. In so holding, this Court recognized that “Alabama law allows broad inquiry of expert witnesses as to the sanity of a defendant on a plea of not guilty by reason of insanity.” Id. at 1171.
In Hamilton v. State, 281 Ala. 448, 203 So.2d 684 (1967), the defendant contended that the trial court erred by allowing a witness to testify as follows: “In my opinion, [the defendant] appeared to be sane.” That testimony was in response to the question: “Did [the defendant] give the appearance of being sane or insane?” Hamilton, 281 Ala. at 451, 203 So.2d at 686. The Alabama Supreme Court held that the trial court did not err by allowing that testimony. Specifically, the Supreme Court stated: “Witnesses, whether expert or nonexpert, may express their opinion as to the sanity or insanity of defendant on *1104 trial for crime.” Hamilton, 281 Ala. at 451, 203 So.2d at 686-87.
In the present case, there was nothing improper about the testimony of Dr. King. Initially, Dr. King simply stated the definition of insanity without giving an opinion. Then, Dr. King was asked whether, in his opinion, Lockhart suffered from a mental disease or defect, and Dr. King responded that Lockhart did not suffer from a mental disease or defect and that he did not see any symptoms of mental illness in Lock-hart. Unlike the psychiatrist in Harris, Dr. King did not state whether he thought Lockhart was sane “from a legal standpoint” or “in a legal sense.” Instead, Dr. King properly testified that, from his standpoint as a mental-health expert, Lockhart did not suffer from mental illness. Such an expert opinion is admissible and does not constitute a legal conclusion that invades the province of the jury. In weighing the evidence, the jury was free to accept or reject Dr. King’s opinion as it saw fit. Therefore, because Dr. King’s testimony did not invade the province of the jury, the trial court’s admission of that testimony did not constitute error, plain or otherwise.
C.
Next, Lockhart contends that the admission of Dr. King’s testimony was plain error because, Lockhart says, Dr. King’s testimony was based on facts not in evidence. Specifically, Lockhart alleges that Dr. King’s testimony was based on “the case file at the District Attorney’s Office, which included Mr. Lockhart’s confessions on two occasions as well as police reports about the particular incident,” and that those items were not admitted into evidence. (Lockhart’s brief, at 19-20.)
To support his argument, Lockhart relies on Ex parte Wesley, 575 So.2d 127 (Ala.1990), and Madison v. State, 620 So.2d 62 (Ala.Crim.App.1992). In Wesley, an expert witness was specifically asked: “Based on all of the foregoing, witness interviews, review of police reports, review of Taylor Hardin [medical] records, interviews with the defendant, review of his records at Taylor Hardin, and your expertise, do you, sir, have an opinion as to whether or not [the defendant] on [the day of the offense], could appreciate the criminality of his conduct?” Wesley, 575 So.2d at 128. Defense counsel objected to that question on the ground that neither the police reports nor the medical records were in evidence and, thus, that an opinion based on that information would be improper. Id. • The trial court overruled that objection. Id. The expert witness then testified that, in his opinion, the defendant could appreciate the criminality of his conduct on the day of the offense. Id. On appeal, the Alabama Supreme Court stated that, although a medical expert is allowed to give opinion testimony based in part on the opinions of others when those other opinions are found in medical records admitted into evidence, the information upon which the expert relies must be in evidence. Wesley, 575 So.2d at 129. Therefore, the Court held that’ because “the police reports and medical records that contained hearsay evidence and upon which [the expert witness] was asked to base his opinion were not offered or admitted into evidence,” the trial court erred in allowing the expert witness’s testimony. Wesley, 575 So.2d at 130.
In Madison, without objection, a psychologist testified that, at the time of the crime, the defendant could appreciate the criminality of his conduct and could conform his conduct to the requirements of the law. The psychologist specifically testified that he relied on the following information in reaching his opinion: information received from the mother of the *1105 defendant’s child; information received from the defendant’s girlfriend; information received from the officer who arrested the defendant and took a statement from him; information received from the chief jailer and his assistant concerning the defendant’s conduct while he was in jail; a memorandum or statement from a psychologist who had monitored the defendant at Holman Correctional Facility; “portions of ... the allegations against [the defendant]”; records from “the At-more, Alabama vicinity”;[2] a taped statement made by the defendant to the police shortly after he was arrested for the commission of the crime; and “some transcripts of court proceedings.” Madison, 620 So.2d at 69-70. None of that information was introduced into evidence. On appeal, this Court stated:
“It is clear from the evidence in this case that [the psychologist’s] opinion was based partly on reports, records, and information obtained from third parties, which neither were in evidence at the time he testified nor were subsequently admitted. It is also apparent that [the psychologist] considered these reports, records, and information as critical in arriving at his opinion. The inescapable conclusion is that [the psychologist’s] opinion was based substantially on information not available for the jury’s consideration, and thus, in accordance with the rule of evidence discussed above, his testimony was inadmissible. See Ex parte Wesley.”
Madison, 620 So.2d at 71 (emphasis added). Accordingly, this Court found that the admission of the psychologist’s testimony “constituted an error so obvious that the failure to notice it seriously affected the fairness or integrity of the proceedings” and, thus, that “the admission of [the psychologist’s] testimony constituted plain error requiring reversal of the appellant’s conviction.” Madison, 620 So.2d at 73.
In the present case, initially, the prosecutor asked Dr. King: “Could you.tell the ladies and gentlemen of the jury about your evaluation of the Defendant; how you did it, what you did?” (R. 4213.) Dr. King responded:
‘Tes, sir. The Court order that I received asked me to address three issues. The first issue was whether or not Mr. Lockhart was competent to stand trial. What’s required in that is whether or not he is — understands the charges against him, can assist his legal counsel in his own defense and can proceed with a reasonable understanding of the legal proceedings that he has to be involved with.
“The second issue I was asked to address was his mental state at the time of the offense for which he was charged. Whether he was experiencing any serious mental illness or mental defect, and if so, whether that rendered him unable to appreciate the nature of his acts.
“The third question -1 was asked to address was whether or not he understood his Miranda rights when he was taken into custody and asked questions by the police.
“Prior to my evaluation of Mr. Lock-hart, I had received information from the case file at the District Attorney’s Office, which included Mr. Lockhart’s confessions on two occasions as well as police reports about the particular, incident that was involved, and any other information that may have been supplied regarding the particular offense. After receiving that, I scheduled an appointment with — I scheduled a time to see Mr. Lockhart here in the Lee County *1106 Justice Center in the jail, and saw him on the date that I already mentioned.
“At that time I went through a clinical interview with him. In other words, I asked him a number of questions about his history to see what information might be appropriate to learn about him, but also just to see if he could answer my questions and make sense and address the issues use.
“As part of that clinical interview, I also went through what’s called a mental status examination which is a series of questions and observations to determine whether or not he was oriented as to person, place, and time. Had he had any unusual symptoms. Showed any signs of any mental illness. And finally, I went through a series of structured questions about his understanding of the judicial process that he was going to be involved in, as well as the various rolls and participants in trial situations. For example, what a judge does, what a jury does, and so on. After I finished the interview with him, I then went through all of the records as well as my interview notes and generated a report, which I then submitted to defense counsel, the District Attorney and also the Court and the clerk.”
(R. 4213-15.)
Later, Dr. King was specifically asked how he determined that Lockhart was not suffering from a mental disease or defect at the time of the offense. Dr. King 'responded:
“One of the things I really rely on for a mental state at the time of the offense are any information or records that I have about the behavior of the perpetrator at the time of the offense. In this particular case, Mr, Lockhart engaged in a series of premeditated actions over a lengthy period of time that were all goal directed towards the abduction and murder of the victim, Lauren Burk. He cased the place where he was going to do this. He backed his car up so that nobody could observe his license tag. He noticed when he first arrived there that there was a police officer in a black and white, so he left the — the area and then returned later. He then abducted the victim, shot her, and when he returned, he tried to destroy evidence by burning her car, and then he fled the scene by leaving to go to Atlanta. All of that says to me that the behaviors were, again, premeditated, planned, organized, and that he had a definite motive to avoid apprehension and detection.”
(R. 4217-18.)
Concerning Dr. King’s determination that Lockhart was not suffering from a mental disease or defect at the time of the offense, the only facts that Dr. King specifically states that he relied on “in this particular case” were the following facts: “[Lockhart] cased the place where he was going to do this. He backed his car up so that nobody could observe his license tag. He noticed when he first arrived there that there was a police officer in a black and white, so he left the — the area and then returned later. He then abducted the victim, shot her, and when he returned, he tried to destroy evidence by burning her car, and then he fled the scene by leaving to go to Atlanta.” (R. 4218.) All of those facts were contained in Lock-hart’s statements that were presented to the jury. (R. 3891-94, 3934-40.) Although Dr. King testified that he “received information from the case file at the District Attorney’s Office, which included Mr. Lockhart’s confessions on two occasions as well as police reports about the particular incident that was involved, and any other information that may have been supplied regarding the particular offense,” he did not state that he relied on the police re *1107 ports or any other specific information that was not admitted into evidence when he explained how he reached his conclusion that Lockhart was not suffering from a mental disease or defect at the time of the offense. Unlike the situation in Wesley, Dr. King was not specifically asked to base his opinion upon evidence that was not admitted into evidence. Furthermore, unlike the situation in Madison, it is neither “clear” that Dr. King’s opinion was based on information that was never admitted into evidence nor “apparent” that Dr. King considered any particular information that was not admitted into evidence as “critical” in arriving at his opinion. We are not faced with an “inescapable conclusion” that Dr. King’s opinion was based “substantially” on information not available for the jury’s consideration. Therefore, we conclude that the admission of Dr. King’s testimony was not an obvious and indisputable error; thus, the trial court’s failure to exclude Dr. King’s testimony did not constitute plain error.
II.
Next, Lockhart contends that Dr. King improperly gave testimony regarding Lockhart’s competency to stand trial and his ability to understand his Miranda rights. Specifically, Lockhart argues that the admission of Dr. King’s testimony regarding Lockhart’s competency to stand trial violated Rule 11.2(b)(1), Ala. R.Crim. P. Lockhart further argues that Dr. King’s testimony regarding Lockhart’s ability to understand his Miranda rights improperly bolstered Dr. King’s conclusion that Lockhart did not have a mental disease or defect at the time of the offense and improperly bolstered the State’s assertion that Lockhart’s statements were voluntary. Lockhart failed to raise any of these arguments in the trial court; thus, they will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
A.
Concerning Lockhart’s competency to stand trial, Dr. King testified: .
“The Court order that I received asked me to address three issues. The first issue was whether or not Mr. Lock-hart was competent to stand trial. What’s required in that is whether or not he is — understands the charges against him, can assist his legal counsel in his own defense and can proceed with a reasonable understanding of the legal proceedings that he has to be involved with.”
(R. 4213.)
Later, when asked to give his opinion concerning whether Lockhart was competent to stand trial, Dr. King stated:
“Mr. Lockhart understood all the questions that I asked him about his understanding of the legal process at trial, and he also understood very well the charges against him; could enumerate them for me in detail. He could disclose information about the time of the alleged offense, whether he was there or not. He also was able to answer all questions about the various roles of participants in the trial situations. So my opinion is and was that he was certainly able to proceed by assisting his legal counsel and also to understand the — the procedure that he was going to be involved in.”
(R. 4215-16.)
Rule 11.2, Ala. R.Crim. P., provides, in pertinent part:
“(a) Motions.
“(1) Competency to Stand Trial. When a person charged with a crime is before a circuit court, the defendant, the defendant’s attorney, or the district at *1108 torney may petition for, or the court on its own motion may order, an examination to assist in the determination of the defendant’s present mental condition and competency to stand trial.
[[Image here]]
“(b) Admissibility of Mental Examinations.
“(1) The results of examinations conducted pursuant to subsection (a)(1) of this rule, Rule 11.3, or Rule 11.4 on the defendant’s mental competency to stand trial shall not be admissible as evidence in a trial for the offense charged and shall not prejudice the defendant in entering a plea of. not guilty by reason of mental disease or defect.”
In Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003), this Court recognized that some of the Committee Comments to Rule 11.2 are inconsistent with the plain language of the rule itself. This Court stated that “[t]he Comments indicate that any finding of competency, not just the results of competency examinations by experts, is inadmissible under Rule 11.2 in a trial for the offense charged, although the rule itself prohibits only the admission of results of competency examinations.” Lewis, 889 So.2d at 663-64. This Court further stated that “Rule 11.2(b)(1) is clear on its face, and we cannot interpret it to prohibit something other than that which it prohibits by its plain language — the admission of results of competency examinations.” Lewis, 889 So.2d at 665.
Furthermore, this Court recognized that, even in capital cases, the harmless-error rule applies to contentions that Rule 11.2 was violated. Rule 45, Ala. R.App. P., provides:
“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire caúse, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
In Lewis, this Court stated:
‘“The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.’ Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
“‘After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); [Ala.] R.App. P. 45. Moreover, the harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a non- *1109 constitutional error to be deemed harmless, the appellate court must determine with “fair assurance ... that the judgment was not substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir.1994). . . . In order for the error to be deemed harmless under Ala. R.App. P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant’s substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’
“Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).
“The apparent purpose behind the prohibition in Rule 11.2, and the suggested prohibition in the Committee Comments to that rule, is to prevent a jury from confusing a defendant’s competence to stand trial with his sanity at the time of the offense and from using a defendant’s competence to negate his insanity defense. Competency to stand trial deals with a defendant’s ‘present ability to assist in his or her defense, Rule 11.1, Ala. R.Crim. P., while sanity deals with a defendant’s mental state ‘at the time of the commission of the acts constituting the offense,’ § 13A-3-1(a), Ala.Code 1975. Rule 11.2(b)(1), in expressly prohibiting the admission of the results of competency examinations during the trial of the offense charged, specifically provides that those results ‘shall not prejudice the defendant in entering a plea of not guilty by reason of mental disease or defect.’ (Emphasis added.) The Committee Comments, stating that any finding of competency is inadmissible during the trial of the offense charged, provide that the purpose of the rule is to. ensure the factual distinction between competency to stand trial and sanity at the time of the offense so as ‘to avoid any prejudice to the defendant.’ (Emphasis added.)”
889 So.2d at 666.
In the present case, to the extent that the admission of Dr. King’s testimony concerning Lockhart’s competency to stand trial was error, it was harmless. There is no reason to believe that the jury was confused as to the distinction between Lockhart’s competence to stand trial and his sanity at the time of the offense or that the jury used Lockhart’s competence to stand trial to negate his insanity defense. In the trial court’s instructions to the jury, the court was very clear that the jury needed to determine whether “at the time of the commission of the acts constituting the crime” Lockhart was suffering from a mental disease or defect that rendered him unable to appreciate the nature and quality or the wrongfulness of his acts. (R. 4354, 4357.) Additionally, there was very little, if any, evidence presented at trial indicating that Lockhart was unable to appreciate the nature and quality or the wrongfulness of his acts at the time of the offense. In fact, in addition to Dr. King testifying that Lockhart could appreciate the nature and quality and the wrongfulness of his acts at the time of the offense, Lockhart’s own expert psychologist, Kimberley Ackerson, testified that there was nothing to indicate that Lockhart was unaware of what he was doing at the time of the offense. (R. 4174.) After viewing the entire record, we conclude that the admis *1110 sion of Dr. King’s testimony concerning Lockhart’s competency to stand trial did not contribute to the jury’s determination that Lockhart was able to appreciate the nature and quality and the wrongfulness of his acts at the time of the offense. Therefore, it is the opinion of this Court that the error complained of did npt probably injuriously affect Lockhart’s substantial rights; thus, any error was harmless.
B.
Concerning Lockhart’s ability to understand his Miranda rights, Dr. King testified:
“The Court order that I received asked me to address three issues....
[[Image here]]
“The third question I was asked to address was whether or not [Lockhart] understood his Miranda rights when he was taken into custody and asked questions by the police.”
(R. 4218.)
Later, after Dr. King was asked to “address [his] evaluation as to whether or not [Lockhart] was qualified to waive his Miranda warnings at the time at the police department and when the Alabama Bureau of Investigation interviewed him,” Dr. King testified:
“[Lockhart] indicated to me that he could not recall or — or believed that he may not have been [able to] read his Miranda rights, but confessions that I saw indicate that he had actually indicated that he was read his Miranda rights and that he waived those. I went through a series of questions about his understanding of Miranda rights at the time that I saw him, and he was able to indicate each portion in turn what those Miranda rights meant, and it was my opinion based on that, also his educational level, and his history without mental illness or mental defect that he was certainly able when he was in custodial interrogation to waive his Miranda rights in an intelligent, voluntary and knowing fashion.
“[Prosecutor]: Certainly had no problem understanding them?
“[Dr. King]: No, he did not.
“[Prosecutor]: Did you go over with him'also to determine that [he] understood them?
“[Dr. King]: I did.”
(R. 4218-19.)
On appeal, Lockhart does not cite any prior controlling decision or a rule of court that prohibits the admission of an expert witness’s testimony concerning whether the defendant had the ability to understand his Miranda rights, and we are not aware of any such controlling authority. The only cases that Lockhart cites in support of his argument are Ex parte Singleton, 465 So.2d 443 (Ala.1985), and Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988); “however, those cases addressed situations in which the trial court had informed the jury that it had already made a determination that the confession was voluntary and admissible, before the jury’s evaluation of the statement.” McWhorter v. State, 781 So.2d 257, 289 (Ala.Crim.App.1999). Thus, those cases concerned the appropriateness of instructions given by the trial court to the jury. Those cases had nothing to do with the admission of expert opinion testimony.
“[Wjhether a confession was voluntary rests initially with the trial court; once the trial judge makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness *1111 as affecting the weight and credibility to be given the confession.”
Singleton, 465 So.2d at 446.
Furthermore,
“ ‘[w]e are clear to the conclusion that whenever a motion is made for the question of the voluntariness of the confession to be determined outside the presence of the jury, the motion should be granted. In such a hearing, the trial judge sitting alone should make a determination upon a proper record of the issue of voluntariness.... If the confession is held voluntary and admitted, the jury’s consideration of that confession and surrounding circumstances shall proceed in accordance with the “Orthodox” procedure, that is, the jury considers the voluntariness as affecting the tueight or credibility of the confession.’ (Emphasis added.)”
Singleton, 465 So.2d at 446-47 (quoting Duncan v. State, 278 Ala. 145, 165, 176 So.2d 840, 859 (1965)).
Under Rule 104(a), Ala. R. Evid., “[preliminary questions concerning ... the admissibility of evidence shall be determined by the court....” However, under Rule 104(e), Ala. R. Evid., that determination by the trial court “does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility.”
In the present case, Dr. King’s opinion testimony concerning Lockhart’s mental ability to understand his Miranda rights was admissible as relevant to the jury’s determination of voluntariness insofar as that determination affected the weight and credibility to be given the statements that Lockhart gave to law-enforcement officials. Testimony like Dr. King’s testimony is admissible as evidence of the surrounding circumstances under which the defendant’s statements were made. Such testimony allows the jury to adequately evaluate the voluntariness of the defendant’s statements in order to assist it in determining the weight or credibility of those statements. Such testimony does not “take away the jury’s function in determining voluntariness,” see Gaddy v. State, 698 So.2d 1100, 1121 (Ala.Crim.App.1995), nor does the testimony affect the jury’s determination whether the defen-' dant was suffering from a mental disease or defect at the time of the offense. Therefore, we conclude that the trial court’s admission of Dr. King’s testimony was not error, much less plain error.
Ill
Next, Lockhart argues that the trial court erred in allowing the State to present to the jury a video recording of his pólice interrogation that allegedly included references to his prior bad acts while he was in the military. Specifically, Lockhart argues that the admission of that prior-bad-acts evidence violated Rule 404(b), Ala. R. Evid. The State responds that the admission of that prior-bad-acts evidence was harmless error.
Despite Lockhart’s arguments and the State’s response, after viewing the entire record, this Court cannot find any place in the record where that prior-bad-acts evidence was presented by the State to the jury. In his brief to this Court, Lockhart alleges that the references to his prior bad acts while he was in the military are included in the video recording of his police interview that was marked as State’s Exhibit 80 at trial and was played for the jury. Specifically, Lockhart alleges that the references to those prior bad acts can be found at “State’s Ex. 80 at 91'15"”; at “[State’s Ex. 80] at 91'10"”; and at “State’s Ex. 80 at 91'30"-92'30".” (Lockhart’s brief, at 27, 29.) However, this Court has reviewed the video recording of Lockhart’s police interview that was marked as *1112 State’s Exhibit 80, and that video has no audio from the 89:56 minute mark to the 92:39 minute mark. We have no idea what Lockhart and the officers were discussing during that time, and whatever was being discussed during that time was removed from the video recording before the video was admitted into evidence at trial. Furthermore, we have watched the entire video recording of the police interview that was marked as State’s Exhibit 80, and we find that no portion of that video contains any audible reference to Lockhart’s prior acts in the military. Therefore, because the State did not present any evidence of' Lockhart’s prior bad acts while he was in the military to the jury, Lockhart’s argument is totally without merit.
IV.
Next, Lockhart contends that the trial court erroneously failed to remove two veniremembers for cause. Specifically, Lockhart argues that the trial court erred when it refused to remove J.S. (prospective juror no. 171) and M.H. (prospective juror no. 67) for cause because, Lockhart says, those prospective jurors expressed fixed opinions that he was guilty.[3] Lock-hart also argues that the trial court erred in failing to remove J.S. for cause because, according to Lockhart, J.S. stated that he would automatically vote for the imposition of the death penalty. Lockhart further states that, because the trial court failed to remove J.S. and M.H. for cause, he was forced to use two of his peremptory challenges to strike those prospective jurors. According to Lockhart, if he would not have been forced to use two of his peremptory challenges to strike J.S. and M.H., he would have used those challenges to strike V.M. (prospective juror no. Ill) and A.M. (prospective juror no. 115), who served on the jury.
This Court has stated:
“ ‘[T]he Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002).’ Pace v. State, 904 So.2d 331, 341 (Ala.Crim.App.2003). Cf. Ex parte Colby, 41 So.3d 1 (Ala.2009) (may not be harmless when multiple challenges for cause are involved).
“Moreover,
“ ‘To justify a challenge for cause, there must be a proper statutory ground or ‘“some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.’ ” Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This court has held that “once a juror indicates initially that he or she is biased or prejudiced or has deepseated impressions” about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror “need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.” Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986).’
*1113 “Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
“ ‘The test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.” Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). “Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’ ” Nettles, 435 So.2d at 153.’
“Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
“ ‘The qualification of a juror is a matter within the discretion of the trial court. Clark v. State, 443 So.2d 1287, 1288 (Ala.Cr.App.1983). The trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.’ Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990). ‘ “[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.” Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000).’ Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008).
“ ‘It is well to remember that the lay persons on the panel may never Have been subjected to the type of leading questions and cross-examination techniques that frequently are employed ... [during voir dire].... Aso, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge may properly choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.’
“Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).”
Thompson v. State, 153 So.3d 84, 116 (Ala.Crim.App.2012).
In the present case, during the jury-selection phase of the trial, when the trial court asked the members of the jury panel whether any of them “believefd] that the death penalty should automatically be imposed when there is a conviction for capital murder,” J.S. raised a card with his juror number on it to indicate that he believed that statement. (R. 2385.) Similarly, when the trial court asked the members of the panel whether any of them “[had] a fixed opinion as to the guilt or innocence of the defendant,” J.S. raised his card again. Id.
During individual voir dire, the following exchange occurred concerning J.S.’s initial indication that he believed the death penalty should automatically be imposed when there is a conviction for capital murder:
“The Court: A’e you telling the Court that you would not consider the imposition of a sentence of life without the possibility of parole?
“[J.S.]: I don’t think so.
“The Court: Okay. Ae your feelings for capital murder sufficiently strong that you would automatically impose the death penalty regardless of the facts 'in the case?
“[J.S.]: No, sir.
*1114 “The Court: Okay.
“[J.S.]: If the facts lead other ways, then he would be innocent.
“The Court: Do you believe your feelings in favor of capital punishment would — that you would be able to abide by existing law and follow conscientiously the instructions of the Court and fairly consider the imposition of life without the possibility of parole if the evidence warranted such?
“[J.S.]: Yes.
“The Court: Are you — are you telling the Court that you would automatically vote for the death penalty no matter what the evidence or trial might reveal?
“[J.S.]: No, sir.
“The Court: Okay. And you are- totally committed — and you are not — let me just reverse the question. So you are not totally committed to voting for the death penalty regardless of the facts or circumstances in the trial?
“[J.S.]: Correct.
“The Court: So you could listen to the evidence — so if we got into the penalty stage of the trial, you could listen to the evidence as presented by the defense and fairly weigh that?
“[J.S.]: Yes.”
(R. 2436-37.)
Concerning J.S.’s initial indication that he had a fixed opinion as to the guilt or innocence of the defendant, the following exchange occurred:
“The Court: Okay. ■ Now, you also answered a question, I think — I asked a question: Do you have a fixed opinion as to the guilt or innocence of the defendant. And do you?
“[J.S.]:, Yes.' At this point I do.
“The Court: Okay. Can you — can you put that opinion aside and — and follow the instructions of the Court, and the instruction of the Court would be that a defendant charged with any criminal case comes into court with a presumption of innocence, that the defendant is presumed to be innocent. The State has the burden of proof in the case to prove the case beyond a reasonable doubt. The defendant has no burden of proof whatsoever. And that the presumption of innocence is to even be regarded as evidence in favor of the defendant. Now, can you put aside your opinions and follow the instructions of the Court?
“[J.S.]: Yes, sir. If they proved he didn’t shoot her, then I could go with that.
“The Court: All right. So you could base your verdict, on the evidence and testimony that you would receive here in the courtroom and not on what your opinion may be—
“[J.S.]: Yes, sir.
“The Court: — or what you may have heard out in the community?
“[J.S.]: Yes, sir.”
(R. 2437-39.)
The prosecutor then questioned J.S. as follows:
“[Prosecutor]: If you are selected as a juror in this case, the first part of the trial would be what’s called the guilt, innocent phase, where the State presents evidence, the defense presents evidence, and then the jury reaches a ver-diet of either — whatever, you know, you are instructed by the Court. If you are on that jury and you found the defendant guilty of capital murder, could you, yourself, vote to impose the death penalty?
“[J.S.]: Yes, sir.
“[Prosecutor]: Could you also consider mitigating evidence, that is anything in the defendant’s life that mitigates *1115 against capital punishment, that being death, and vote for the life without the possibility of parole?
“[J.S.]: If he is found guilty of killing her, I would vote for the death penalty.
“[Prosecutor]: You couldn’t consider mitigation and vote for life without parole, or you couldn’t?
“[J.S.]: I wouldn’t. Could I? Yes, sir, I could, but I don’t think I would.
“[Prosecutor]: Well, if the Court instructed you to consider life without parole—
“[J.S.]: Then I would consider it, yes, sir.
“[Prosecutor]: You would consider it?
“[J.S.]: Yes, sir.
“[Prosecutor]: So you could be fair in the penalty phase as far as considering mitigating evidence and aggravating circumstances and render a recommendation to the Court of either death or life without parole?
“[J.S.]: Yes.”
(R. 2439-41.)
Defense counsel then questioned J.S. as follows:
“[Defense counsel]: .... Now, my question to you is, if you find with your fellow jurors that Mr. Lockhart is guilty of capital murder, which you would have to find, the Court will instruct you, that he intentionally shot and killed Lauren Burk and you determine that by your guilty verdict with your fellow jurors, would you say, look, this guy — I found him guilty of intentionally killing this woman, the defense, I don’t care what y’all present, at that point I am going to automatically give him the death penalty. Would you—
“[J.S.]: No, I would not do that.
“[Defense counsel]: You would not do that?
“[J.S.]: No.
“[Defense counsel]: Okay. So you— at the point you and your jurors — fellow jurors find him guilty of. capital murder, you are telling this Court that you would consider evidence from both sides and then make a determination of whether to give him life without parole—
“[J.S.]: Yes.
“[Defense counsel]: — or the death penalty?
“[J.S.]: Yes.
[[Image here]]
“[Defense counsel]: Now, you indicated to the Court that you had a fixed opinion about Mr. Lockhart’s guilt. Where — why do you have that fixed opinion? Where are you getting that from?
“[J.S.]: Again, from initial conversation about it.
“[Defense counsel]: Okay. Initial conversation?
“[J.S.]: Uh-huh (affirmative response).
“[Defense counsel]: Through what source? What conversation?
“[J.S.]: Just general acquaintances.
“[Defense counsel]: Okay. And is any of your fixed opinion also coming from what you read in the news media?
“[J.S.]: Yes.
“[Defense counsel]: Now, if you are selected as a juror on this case, the Court is going to instruct you that you have to base your verdict solely on the evidence presented in this courtroom, what comes from the witness stand, any exhibits in this case and the Judge will instruct you regardless of what you have heard, what conversations you had with people, what you read or heard in the media, that cannot even enter the deliberation room in your mind in your deliberations.
*1116 “[J.S.]: Right.
“[Defense counsel]: Do you think you are going to be able to do that, keep that from your mind in deliberations, what you have heard and read in the news?
“[J.S.]: Yes, sir.”
(R. 2443-15, 2447-49.)
Defense cocounsel then asked some follow-up questions:
“[Defense cocounsel]: You said that you hadn’t heard anything about this since it first occurred two and a half years ago. Is that correct?
“[J.S.]: Yes, sir.
“[Defense cocounsel]: And you made up your mind two and a half years ago that the defendant was guilty?
“[J.S.]: Yes, sir.
“[Defense cocounsel]: And you have held that opinion for two and a half years?
“[J.S.]: Yes, sir.
“[Defense cocounsel]: And you have answered in your questionnaire that you would stand by your original opinion despite what others believe.
“[J.S.]: No, sir. If the evidence weighs differently, then I would go with the evidence.
“[Defense cocounsel]: I believe you also said under the questioning that if they prove the defendant not guilty. Now, are you talking — who—who would they be? Us or the State?
“[J.S.]: Whoever had the evidence that proved him not guilty, which would be you, then we would go with a not guilty verdict.
[[Image here]]
“[Defense cocounsel]: You indicated that you — do you believe at this particular point in time that the defendant is presumed innocent?
“[J.S.]: Yes.”
(R. 2449-51.)
Defense counsel then challenged J.S. for cause, arguing only that J.S. would automatically impose the death penalty. (R. 2453.) The trial court denied that challenge. Id.
Concerning M.H., when defense counsel asked the members of the jury panel whether any of them “believefd] that Courtney Lockhart has to be guilty of something or else he would not be on trial,” M.H. raised a card with her juror number on it indicating that she believed that statement. (R. 1687.) Later, the following occurred during the voir dire of M.H.:
“[Defense cocounsel]: Yesterday, I think you had indicated that — in the large panel — that you believed that the defendant had to be guilty of something or else he wouldn’t be here in court?
“[M.H.]: Uh-huh (affirmative response).
“[Defense cocounsel]: Is that your belief?
“[M.H.]: Yes. Yes.
“[Defense cocounsel]: Would it be influenced by your statement just a few minutes ago that you said in the very beginning that you read about it, heard about it, and then heard or read where they found the guy?
“[M.H.]: Uh-huh (affirmative response).
“[Defense cocounsel]: When — when you said that, it’s like you already had a preconceived idea that the defendant was guilty. Is that correct?
[[Image here]]
“[M.H.]: No, sir. That’s not what I •meant.
“[Defense cocounsel]: Ma’am?
*1117 “[M.H.]: No, sir. That’s not what I meant.
“[Defense cocounsel]: Could you explain what you meant?
“[M.H.]: Well, from what I recall way back when all this happened, it was my understanding that the person confessed. I may not be correct about that. But that was my recollection. But that’s where that was coming from.
“[Defense cocounsel]: And do you still hold that opinion that you believe that he confessed, therefore, he was the guy, and therefore, he is guilty? Would that be a logical progression of your thoughts?
“[M.H.]: Well, if he confessed, I would think that he would probably be guilty.
“[Defense cocounsel]: Would that prevent you from being fair and impartial to Mr. Lockhart in the trial of — guilt phase ■ of this case?
“[M.H.]: No.
“[Defense cocounsel]: You could be fair and impartial?
“[M.H.]: Uh-huh (affirmative response).
“[Defense cocounsel]: Okay.
“The Court: Okay. And, ma’am, just as a follow up, and I think you have answered it, but basically you — can you put aside everything you have read or heard about this case and if you were selected as a juror in this case just render a fair and impartial verdict for both sides?
“[M.H.]: Yes, sir.
“The Court: And just base your verdict and decision solely on what you hear in the coui’troom, from witnesses who are actually sworn in, or from exhibits that are actually entered into evidence?
“[M.H.]: Yes, sir.”
(R. 1886-89.)
We find that the trial court did not exceed its discretion in failing to remove J.S. and M.H. for cause. J.S. initially indicated that he believed that the death penalty should automatically be imposed for a capital-murder conviction. However, after subsequent questioning by the trial court, J.S. stated that he would abide by existing law and follow the trial court’s instructions concerning the imposition of life without the possibility of parole and that he would not automatically vote for the imposition of the death penalty. Therefore, the trial court did not exceed its broad discretion in failing to grant defense counsel’s challenge for cause based on J.S.’s views concerning the imposition of the death penalty.
Similarly, J.S. initially indicated that he had a fixed opinion as to the guilt or innocence of Lockhart. However, after subsequent questioning, J.S. stated that he would set his personal opinion aside, follow the instructions of the trial court, and base his verdict on the evidence that was presented at trial. He also stated that he believed that the defendant is presumed innocent before he is tried. Therefore, the trial court did not exceed its discretion in failing to sua sponte remove J.S. for cause based on his views concerning Lockhart’s guilt or innocence.
Likewise, M.H. initially indicated that she believed that Lockhart had to be guilty of something or he would not be on trial. However, after subsequent questioning, M.H. clarified that she did not have a preconceived idea that Lockhart was guilty. She also stated that she could set aside everything she had heard or read about the case and that she could render a fair and impartial verdict based solely on the evidence presented at trial. Therefore, the trial court did not exceed its *1118 discretion in failing to sua sponte remove M.H. for cause.
V.
Next, Lockhart argues that “the trial court erroneously instructed the jury that it could convict Mr. Lockhart of capital murder without a specific intent to kill.” (Lockhart’s brief, at 34.)
The trial court gave the following instructions to the jury concerning intent:
“Now, to convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder during robbery in the first degree: ■
[[Image here]]
“Three: That in committing the act which caused the death of Lauren Burk, the defendant intended to kill the deceased. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be a — must be real and specific.
[[Image here]]
“Five: That in the course of committing or attempting to commit the theft or in the immediate flight after the attempt of commission, the defendant either used force or threatened the imminent use of force against the person of Lauren Burk with the intent to overcome her physical resistance or physical power of- resistance or to compel the acquiescence to the taking of or escaping with the property.
[[Image here]]
“Now, when I went through those seven elements — and remember, each one of those must be proven beyond a reasonable doubt — we talked about various terms. And so I am going to define those for you.
“A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another with the intent to deprive the owner of his or her property.
[[Image here]]
“We talked about acting intentionally. That’s defined as: A person acts intentionally with respect to a result or to a conduct when his or her purpose is to cause that result or to engage in that conduct. Or in laymen’s terms, did the person mean to do it.”
(R. 4341-42, 4346-47.) After the jury instructions were given, both parties stated that they were satisfied with the instructions.
During the jury’s deliberations, the jury asked the trial court:
“What is the definition of intent according to element three defined by capital murder first degree, robbery; please give an example.”
(R. 4375.)
The trial court responded to the jury as follows:
“Now, ladies and gentlemen, I will go back over exactly what we went over before. And this is the beginning at basically the second sentence of paragraph three: A person acts intentionally when it is'his purpose to cause the death of another person. The intent to kill must be real and specific.
“Then also as part of that charge we went over the definition of intentionally. It states: A person acts intentionally with respect to a result or to a conduct when his or her purpose is to cause that result or to engage in that conduct. Or in layman’s terms, did the person mean to do it.”
(R. 4375-76.)
Concerning those instructions, defense counsel objected to the trial court’s de *1119 scribing the definition of intent “in layman’s terms” as “did the person mean to do it,” but he stated that he was otherwise satisfied with the instructions.
On appeal, Lockhart specifically argues that the trial court’s instruction that “a person acts intentionally with respect to a result or to a conduct when his or her purpose is to cause that result or to engage in that conduct” allowed the jury to convict him without finding the specific intent to kill. Lockhart failed to raise that specific argument before the trial court; thus, the argument will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
We recently addressed an almost identical argument in Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013):
“Boyle specifically argues that the circuit court’s instruction that ‘you act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct’ allowed the jury to convict without finding the specific intent to kill. This portion of the court’s instruction is identical to the statutory definition of ‘intentional’ contained in § 13A-2-2, Ala.Code 1975. Section 13A-2-2(1), Ala.Code 1975, states: ‘A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.’
“The Alabama Supreme Court, in addressing a circuit court’s use of a jury charge in a capital-murder case that contained the exact definition of ‘intentional’ contained in § 13A-2-2(1), stated:
“ ‘The trial court, in defining mental culpability, read Code 1975, § 13A-2-2, to the jury verbatim, thereby defining each mental state along the spectrum from “intentional” to “criminal negligence.” Each definition was relevant to the various verdict options except “criminal negligence.” The definition of “intentionally” was relevant to the court’s instructions on the “intent to kill” element of the capital offense.’
“Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985).
“This Court may find plain error in a jury instruction only if ‘there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996). See also Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). The jury was instructed that in order to convict Boyle of capital murder the jury had to find that Boyle had the specific intent to kill. There is no reasonable likelihood that the jurors applied the challenged instruction in an improper manner. There was no plain error in the circuit court’s instructions on intent.”
154 So.3d at 217.
Likewise, in the present case, the jury was instructed that in order to convict Lockhart of capital murder the jury had to find that he had the specific intent to kill. There is no reasonable likelihood that the jurors applied the challenged instruction in an improper manner. Therefore, there was no plain error in the trial court’s instructions on intent.
VI.
Next, Lockhart argues that the trial court erroneously denied his motion to suppress the statements he made to law-enforcement officials. Specifically, Lock-hart argues that he did not knowingly and voluntarily waive his right to counsel before giving the statements and that his statements were involuntary.
*1120 Concerning the standard of review of a trial court’s ruling on a motion to suppress, this Court has stated:
“ ‘ “ ‘The question of whether a confession was voluntary is initially to be determined by the trial court.’ ” Minor v. State, 914 So.2d 372, 388 (Ala.Crim.App.2004), quoting Jackson v. State, 562 So.2d 1373, 1381 (Ala.Crim.App.1990). “[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court’s resolution of [such] conflict[s] should not be reversed on appeal.” Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993) (citations omitted). “[A] trial court’s ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion.” Jackson v. State, 589 So.2d 781, 784 (Ala.Crim.App.1991). “When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal ‘unless found to be manifestly contrary to the great weight of the evidence.’ ” Ex parte Matthews, 601 So.2d 52, 53 (Ala.1992), quoting Williams v. State, 456 So.2d 852, 855 (Ala.Crim.App.1984). “ ‘In reviewing the correctness of the trial court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986).’ ”
Phillips v. State, 65 So.3d 971, 1021 (Ala.Crim.App.2010) (quoting Eggers v. State, 914 So.2d 883, 899 (Ala.Crim.App.2004)).
A.
Concerning whether he knowingly and voluntarily waived his right to counsel, Lockhart argues that the actions of the law-enforcement officers in the present case violated State v. Collins, 937 So.2d 86 (Ala.Crim.App.2005) (plurality opinion). Specifically, Lockhart argues that before signing a form waiving his Miranda rights, he made an ambiguous reference to invoking his right to counsel and that the officers were required to make an inquiry to clarify that ambiguity before they proceeded with questioning but failed to make that inquiry.
This Court has stated:
“During a custodial interrogation, if the suspect unequivocally requests counsel at any time before or after the suspect waives his Miranda rights, ‘the interrogation must cease until an attorney is present.’ Miranda, 384 U.S. at 474. If the suspect makes an equivocal reference to an attorney after waiving his Miranda rights, the interrogating officer has no obligation to stop questioning the suspect and the officer is not required to ask questions to clarify whether the suspect actually wants an attorney. Davis v. United States, 512 U.S. 452, 459-62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). However, if a suspect makes an equivocal reference to an attorney before waiving his Miranda rights, the interrogating officer is required to ask questions to clarify the reference until the suspect either clearly invokes his right to counsel or waives it. See State v. Collins, 937 So.2d 86, 93 (Ala.Crim.App.2005) (holding that ‘[bjecause [the defendant] did not waive her Miranda rights before she asked the questions about obtaining a lawyer, the ambiguity *1121 of her questions required the interrogating officer to ask follow-up questions to clarify the ambiguity’).
[[Image here]]
“In determining whether a suspect’s statement was an unequivocal invocation of his right to counsel, we are guided by the following principles:
“ ‘ “The applicability of the ‘ “rigid” prophylactic rule’ of Edwards[ v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (1981) ] requires courts to ‘determine whether the accused actually invoked his right to counsel.’ Smith v. Illinois, [469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984)] (emphasis added), quoting Fare v. Michael C., 442 U.S. 707, 719 [99 S.Ct. 2560, 2569, 61 L.Ed.2d 197] (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barett, supra, 479 U.S. [523], at 529 [107 S.Ct. [828] at 832 (1987)]. Invocation of the Miranda right to counsel ‘requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.’ McNeil v. Wisconsin, 501 U.S. [171] at 178 [111 S.Ct. [2204] at 2209 (1991).] . . .
“ . As we have observed, ‘a statement either is such an assertion of the right to counsel or it is not.’ Smith v. Illinois, 469 U.S., at 97-98 [105 S.Ct., at 494] (brackets and internal quotation marks omitted). Although a suspect need not ‘speak with the discrimination of an Oxford don,’ post, at 476, 114 S.Ct., at 2364 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.” ’
“Ex parte Cothren, 705 So.2d 861, 864 (Ala.1997) (quoting Davis, 512 U.S. at 458-59).
“Furthermore, a suspect’s reference to an attorney is equivocal if ‘ “a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel.” ’ Cothren, 705 So.2d at 864 (quoting Davis, 512 U.S. at 459). ‘[T]he proper standard to be used in resolving this issue is an objective one — whether a police officer in the field reasonably could have concluded from the circumstances that a suspect was not absolutely refusing to talk without the assistance of an attorney.’ Cothren, 705 So.2d at 866-67.
“Equivocal has been defined as:
“ ‘ “ ‘Having different significations equally appropriate or plausible; capable of double interpretation; ambiguous,’ 5 Oxford English Dictionary 359 (2d ed., J.A. Simpson & E.S.C. Weiner, eds., 1989); and as: ‘Having two or more significations; capable of more than one interpretation; of doubtful meaning; ambiguous,’ Webster’s Third International Unabridged Dictionary 769 (1986).” ’
“Cothren, 705 So.2d at 866 (quoting Coleman v. Singletary, 30 F.3d 1420, 1425 (11th Cir.1994)).”
Thompson v. State, 97 So.3d 800, 806-08 (Ala.Crim.App.2011).
In Collins, the main opinion set forth the evidence that was presented via a videotaped statement as follows:
“The videotape indicates that Collins was in an office with two police officers. One officer read the Miranda rights to Collins. The officer stated during the initial portion of the videotape that he had read Collins her rights earlier that *1122 day. (Supp. R. 14.) After the officer read those rights to Collins, she said, ‘Okay, let me ask you a question[. It] says that I have, I can have a lawyer[.] I will have to wait to get one.’ The officer answered, ‘And that’s correct.’ Collins asked, ‘And I will have to wait til when?’ The officer did not respond. (Supp. R. 15.) Instead, the officer looked away from Collins and cast his eyes downward, onto the waiver-of-rights form, , which he appeared to fill out while Collins waited for an answer to her question. After approximately 10 seconds passed, the officer placed the waiver-of-rights form in front of Collins and asked her to read the paragraph on the form. Collins read, T fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing.' No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.’ (Supp. R. 15.) The officer asked Collins if she understood the rights. She did not answer orally, but she signed the waiver-of-rights form. (Supp. R. 12.) She then answered all of the officer’s questions about the accident.”
Collins, 937 So.2d at 89-90.
Based on those facts, this Court held that the trial court correctly granted the defendant’s motion to suppress. The main opinion stated that
“because Collins asked, ‘And I will have to wait til when?’ (Supp. R. 15) (emphasis added), and because the officer ignored the question, there remained an ambiguity regarding whether Collins wanted to talk to an attorney. We find that, under the facts of this case, the officer had a duty to clarify on the record whether Collins wanted to contact her own attorney, whether she was indi-
gent and needed appointed counsel, or whether she wanted to waive her Miranda rights and answer questions. From the record before us, we cannot find the knowing and voluntary waiver of rights required by Miranda.”
Collins, 937 So.2d at 93.
In the present case, during the pretrial suppression hearing, William Lewis, a Phenix City police officer, testified that he orally advised Lockhart of his Miranda rights shortly after Lockhart was arrested and brought to an interview room at the police department. (R. 586.) Officer Lewis also testified that Lockhart orally indicated that he understood those rights. (R. 591.) Officer Lewis then talked with Lockhart about a firearm and subsequently left to recover the firearm. He instructed another officer, Andy Langley, to interview Lockhart. Officer Langley’s interview was recorded on a DVD. Officer Langley read the Miranda rights to Lock-hart. After that reading, the following exchange occurred:
“Langley: Do you have any questions about any of your Miranda rights? .
“Mr. Lockhart: How long will it take for a lawyer to get here?
“Langley: I don’t know.
“Mr. Lockhart: I don’t want to be sitting here all day. I don’t know. It’s like, this is my life.
“Langley: Well, I can tell you this, you know, the best thing you can do for yourself is to be honest about everything. And I mean that from my heart. Now, I am not lying to you. I am telling you the truth. The best thing you can do is to be honest.
“Mr. Lockhart: I watch, you know, the Court T.V. and the stuff they call Lock Up and stuff. I watch that stuff all the time.
“Langley: Uh-huh.
*1123 “Mr. Lockhart: And they know — they say the same thing and then they go and tell — they get them to tell the story and then they go tell right back and they say they are going to help them but then they don’t help them.
“Langley: Well, at Court T.V. and whatever else you are watching, that’s— that’s — you think about this, a lot of that is T.V. That — T.V. has a lot to do with that. Now, do you understand what I read to you?
“Mr. Lockhart: Yes. Come on. Yes.
“Langley: Sign here. Your signature indicates that your rights were read to you and that you understand your rights.
“(Mr. Lockhart signing document.)”
(R. 552-58.)
At the suppression hearing, Lockhart testified that no law-enforcement officer informed him of his Miranda rights before the interview with Officer Langley. Lock-hart further testified that he understood the Miranda rights after Officer Langley read them to him. However, Lockhart testified that he thought he was asking for a lawyer when he asked how long it would take for one to get there and that he kept talking because, he said, “[Officer Langley] told me it was in my best interest if I go ahead and talk and that he could help me.” (R. 949-50.)
We hold that the trial court did not err in finding that Lockhart knowingly and voluntarily waived his right to counsel before giving statements to the law-enforcement officers. Officer Lewis testified that he advised Lockhart of his Miranda rights; that Lockhart indicated that he understood those rights; and that Lockhart then talked to him. Absent any evidence of coercion, that testimony by Officer Lewis was sufficient to establish an implied waiver of Lockhart’s Miranda rights. See Berghuis v. Thompkins, 560 U.S. 370, 885 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010) (holding that if the State shows that a defendant was advised of his Miranda rights and that he understood those rights, the defendant’s un-coerced statement establishes an “implied waiver” of his rights). Contrary to Officer Lewis’s testimony, Lockhart testified that he was not advised of his Miranda rights before the interview that was conducted by Officer Langley. However, “any conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court.” Phillips, 65 So.3d at 1021. In the present case, the trial court found that “the defendant gave his statement regarding the gun after having been properly informed of his Miranda rights.” (C. 641.) Therefore, to the extent Lockhart’s inquiry concerning how long it would take for a lawyer to get to the police station can be viewed as an equivocal reference to his right to counsel,[4] the reference was made after waiving his Miranda rights; thus, Officer Langley had no obligation to ask questions to clarify whether Lockhart actually wanted an attorney. Thus, the trial court did not err in denying Lockhart’s motion to suppress.
B.
Next, Lockhart argues that his confession was involuntary because, he says, “the law enforcement officers relied on false promises, appeals to religion, and a lengthy and coercive interrogation in order to obtain his confession.” (Lockhart’s brief, at 45.) Before the trial court, Lock-hart failed to argue that his statements *1124 were involuntary because the law-enforcement officers made appeals to religion; thus, that specific argument will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
Concerning whether the law-enforcement officers made false promises that rendered Lockhart’s statements involuntary, Lockhart specifically argues that his will was overborne by a promise that he could see his daughter.
. During Lockhart’s police interrogation, he asked to see his 2-year-old daughter and stated that he would tell the police officers everything they wanted to know about the incident in Auburn if he could see her. The officers asked Lockhart for the location and age of his daughter and made statements indicating that they would bring his daughter to him and urging him to make a. statement. Lockhart confessed to his involvement in Burk’s death, and Lockhart’s daughter was never brought to the police station. At the suppression hearing, Officer Lewis testified that the officers tried to arrange to have Lockhart’s daughter brought to the police station, but they were unable to do so because either the child’s mother or grandmother would not agree to bring the child to the police station. (R. 600.)
In Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007), this Court stated:
“Harris also contends that the statements he made to police were involuntary because, he says, they were obtained through illegal inducement. Specifically, Harris asserts, his statements to police were made in exchange for Watson’s allowing Harris to speak with Janice and. to see his daughter, Shay, and were, therefore, improperly induced.
“ ‘ “It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut ], 367 U.S. [568,] 602, 81 S.Ct. [1860,] 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne ’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“ ‘ “The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that,' to admit a confession, a court must determine that the defendant’s will was not over *1125 borne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’) (emphasis added). Thus, to determine whether McLeod’s confession was improperly induced, we must determine if his will was ‘overborne’ by an implied promise of leniency.
[[Image here]]
Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant’s will was overborne by ‘apprehension of harm or hope of favor.’ See [Ex parte ] Gaddy, 698 So.2d [1150] at 1154 [(Ala.1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant’s will has been overborne, we must assess ‘the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure’; ‘[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.’ Jackson, 562 So.2d at 1380-81 (citations omitted).”
“ ‘McLeod v. State, 718 So.2d 727, 729-30 (Ala.1998) (footnote omitted).’
“Jones v. State, 946 So.2d 903, 915-916 (Ala.Crim.App.2006).
“In this case, the evidence shows that, while engaged in a general conversation with Watson, Harris asked to see Janice and Shay. He told Watson that after he talked with Janice, he would give Watson the whole story of what had happened. There is no evidence indicating that Watson broached the subject of letting Harris see Janice. Instead, the evidence is undisputed that Harris made the request to see Janice and Shay, and then told Watson of his own volition that he would tell the whole story when he came back from seeing them. There is no evidence indicating that Watson placed any conditions on Harris when he went to see Janice, such as allowing Harris to see Janice and Shay in exchange for a statement. In short, there was no bargain made with police before Harris gave statements to them. As Watson testified, he granted Harris’s request to see Janice because Harris had been cooperative up to that point. There is no suggestion of a promise of leniency to Harris if he provided police with a statement or confession.
“There is simply no evidence to support a finding that Harris was under any kind of pressure from law enforcement when he gave his statement to Watson or.later, when he gave a second statement to Agent Smith, or the following day, when he gave a third statement to ABI Agent Johnny Tubbs. Indeed, Harris does not even contend that the latter two statements were the products of improper inducement.
“Based upon our review of the totality of the circumstances surrounding Harris’s statements, we find there is simply no evidence that Harris’s will was overborne or that law-enforcement officials improperly induced him to make statements based upon promises of leniency, hope of a favor, or any other reason that would constitute an inducement such as to render his statements involuntary. *1126 Accordingly, we hold that the trial court did not abuse its discretion in allowing Harris’s statements to law enforcement into evidence.”
2 So.3d at 894-96.
Likewise, in the present case, there is no evidence indicating that Lockhart’s will was overborne. There is no evidence indicating that the police officers broached the subject of letting Lockhart see his daughter. Instead, the evidence is undisputed that Lockhart made the request to see his daughter and then told the officers of his own volition that he would tell the whole story concerning what happened in Auburn if he could see her. There is no evidence indicating that the officers placed any conditions on bringing Lockhart’s daughter to the police station,. such as allowing Lockhart to see his daughter only if he gave a statement. In fact, Detective Randy Armstrong told Lockhart that he would be able to see his daughter regardless of what happened. There was simply no bargain made with the officers before Lockhart gave statements to them.
Moreover, there is no evidence indicating that Lockhart’s will was overborne. Lockhart was 23 years old at the time of the interrogation, had graduated from high school, had served in the military, and had an overall IQ score of 86, which is classified as low average. There was also evidence indicating that Lockhart had some experience with the criminal-justice system because he had been sent to a juvenile facility for a period and had been court-marshaled in the military.
Thus, there is no evidence indicating that Lockhart’s will was overborne or that the police officers improperly induced him to make statements based upon promises of leniency, hope of a favor, or any other reason that would constitute an inducement so as to render his statements involuntary. Accordingly, we hold that the trial court did not abuse its discretion in allowing Lockhart’s statements into evidence.
Lockhart also argues that the law-enforcement officers relied on appeals to religion in order to obtain his confession. In an interview preceding the interview in which Lockhart confessed to his role in Burk’s death, Lockhart was interviewed by Sergeant Chad Wood, a police officer with the Newnan, Georgia, Police Department. Sergeant Wood interviewed Lockhart concerning a robbery that occurred at a Wal-Mart store in Newnan on March 7, 2008. During that interview, Sergeant Wood made references to God and asked Lock-hart whether he was “right with God.” Sergeant Wood also asked Lockhart: “If you keeled over right now and you went before God, would he give you your halo and your wings and your golden fleeces to go to heaven?” At the suppression hearing, Sergeant Wood testified that he interviewed Lockhart concerning only the robbery in Newnan. Sergeant Wood further testified that, at the time he conducted the interview, he did not know anything about Burk’s death and was not aware that Lockhart might be charged with murder. During his interview with Sergeant Wood, Lockhart did not say anything about Burk.
This Court has held that the mere fact that a police investigator prays with the defendant before his confession does not amount to coercion. Baird v. State, 849 So.2d 223, 233 (Ala.Crim.App.2002); see also Bradley v. State, 577 So.2d 541, 551 (Ala.Crim.App.1990) (holding that prayer between the defendant and a sheriffs department sergeant, who was a Pentecostal lay minister, and sergeant’s encouragement to “get in touch” with purported “visions” from God about the killer and the murder did not amount to psychological pressure, coercion, or improper influence to disclose the content of the “visions”). *1127 This Court has further held that reading from the Bible during an interrogation does not constitute coercion so as to render a defendant’s confession involuntary. Bush v. State, 523 So.2d 538, 554-55 (Ala.Crim.App.1988).
The video recording of Sergeant Wood’s interview of Lockhart indicates that Sergeant Wood’s references to God did not amount to psychological pressure that would render a confession- involuntary. Furthermore, Lockhart’s confession concerning Burk was given in a different interview with different law-enforcement officers. Therefore, the trial court’s failure to suppress Lockhart’s confession based on Sergeant Wood’s references to God did not adversely affect Lockhart’s substantial rights; thus, no plain error occurred.
Lockhart also argues that the length and nature of the interrogation was coercive. Specifically, Lockhart states that he was interviewed for over seven hours on the day he confessed to his role in Burk’s death and that he was never given any food. He also states that he was never given a “meaningful break,” and he notes that he vomited at the beginning of the interview in which he confessed to his role in Burk’s death.
In Bush, this Court held that the record did not support an inference that a four-hour interrogation, with the defendant handcuffed by one hand to a chair, rendered the defendant’s confession involuntary or amounted to coercion. This Court noted that nothing in the record indicated that, at the time of the interrogation, the defendant was suffering from lack of sleep or was deprived of food, drink, or bathroom facilities, and the defendant’s appearance in photographs taken immediately after the interrogation was normal and did not reflect fatigue, exhaustion, or mistreatment. Bush, 523 So.2d at 554-55.
In the present case, the evidence in the record indicates that Lockhart was asked on multiple occasions whether he needed anything, and he never requested food. There is evidence indicating that Lockhart was given drinks, which he consumed. Lockhart was not deprived of bathroom facilities. Lockhart was given several breaks between interviews, during which time he was in the interview room alone and rested his head on the table. At the.beginning of the interview in which he confessed to his role in Burk’s death, Lockhart did vomit into a trash can. However, the video reflects that, after Lock-hart vomits, the officers ask him whether he is alright, they tell him to take his time, they give him a cup of water, they tell him they want him to be comfortable, and they remove his handcuffs. Then, after a short period, an officer asks Lockhart whether he is getting better, and Lockhart explicitly responds that he is better. That officer then begins the interview and states that “we’re going to take our time and take it slow. I know you’re nervous. We’re nervous. We’re just going to get through it and do the best we can. I want you to be comfortable.” We have reviewed the video of the interview, and Lockhart does not appear to be in any abnormal condition. Lockhart does not appear to be exhausted or mistreated when he confesses to his role in Burk’s death. Therefore, based on the totality of the circumstances, we conclude that the trial court did not abuse its discretion in finding that Lockhart’s confession was voluntary and was not the result of coercion.
VII.
Next, Lockhart contends that the trial court violated state and federal law by overriding the jury’s, unanimous sentencing recommendation of life imprisonment without the possibility of parole. Specifically, Lockhart contends that the trial *1128 court erroneously premised its override on alleged robberies of which he had not been convicted; that the trial court erroneously found that the jury was unaware of the full extent of his military disciplinary record; and that the trial court erroneously failed to give the jury’s recommendation the proper weight.
Section 13A-5-47, Ala.Code 1975, provides:
“(a) After the sentence hearing has been conducted, and after the jury has returned an advisory verdict, or after such a verdict has been waived as provided in Section 13A-5-46(a) or Section 13A-5-46(g), the trial court shall proceed to determine the sentence.
“(b) Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any. part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case.
“(c) Before imposing sentence the trial court shall permit the parties to present arguments concerning the existence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case. The order of the arguments shall be the same as at the trial of a case.
“(d) Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5^19, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant’s participation in it.
“(e) In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or 13A-5-46(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”
In the present case, in accordance with § 13A-5-47(d), Ala.Code 1975, the trial court issued a written sentencing order that detailed its findings concerning the existence or nonexistence of each statutory aggravating circumstance, each statutory mitigating circumstance, and additional nonstatutory mitigating circumstances. Concerning statutory aggravating circumstances, the trial court found that Lock-hart committed the murder while engaged in a robbery and a kidnapping. (C. 1070-73.) Concerning statutory mitigating circumstances, the trial court found that Lockhart had no significant history of pri- or criminal activity, but the court gave this mitigating circumstance “very little weight” because “[Lockhart’s] record contains several violations that were under the jurisdiction of the U.S. Army, including simple assault and communicating a threat.” (C. 1074.) The trial court also *1129 found that Lockhart committed the murder while he was under the influence of extreme mental or emotional disturbance, but the court gave this mitigating circumstance “little weight” because neither expert who testified at trial testified that Lockhart’s mental state was severe enough to influence him as to the commission of the offense, neither Lockhart nor his family sought mental-health treatment for him, and Lockhart’s mental state did not seem to interfere with his employment. (C. 1074-75.) Concerning nonstatutory mitigating circumstances, the trial court found that Lockhart is loved by his family and is a good father to his daughter; that Lock-hart had virtually no relationship with his father; that, while Lockhart was in the military, a certain sergeant became a father figure to Lockhart but was subsequently killed; that Lockhart served in the military; and that Lockhart had been well-behaved while incarcerated. (C. 1076-77.) In accordance with § 13A-5-47(e), Ala. Code 1975, and Ex parte Carroll, 852 So.2d 833 (Ala.2002), the trial court also considered the jury’s recommendation as a mitigating circumstance; however, based on information known only to the trial court and not to the jury, the court stated that “the great weight the court would otherwise place on the jury’s recommendation is substantially reduced.” (C. 1087.)
A.
Lockhart first argues that the court erroneously considered alleged robberies of which he had not been convicted. Specifically, Lockhart contends that unadjudicat-ed crimes cannot be used to undermine a mitigating circumstance; that his due-process and confrontation rights were violated because, he says, he was not given a meaningful opportunity to challenge the evidence of the robberies; and that the trial •court’s consideration of the robberies constituted consideration of a nonstatutory aggravating circumstance, which is improper under Alabama law. .
In the trial court’s sentencing order, regarding additional facts unknown to the jury, the court discussed Lockhart’s commission of several robberies around the time Burk was murdered. (C. 1079-83.) The trial court stated that it was aware of those additional facts as a result of the pretrial suppression hearings, the pretrial Rule 404(b) hearings, and the presentence investigation report. (C. 1079.) Those additional facts concerning the .robberies included confessions made by Lockhart during his interviews with the police. Recordings of those police interviews were played for the trial court during the pretrial suppression hearings but were never played for the jury. Also, substantial information about Lockhart’s confessions to the robberies was included in the presen-tence report. The jury did not receive any information concerning the robberies. In its sentencing order, the trial court cited the robberies and Lockhart’s military disciplinary record as additional facts that were unknown to the jury, and the court used those additional facts to justify overriding the jury’s sentencing recommendation of life imprisonment without the possibility of parole.
Lockhart contends that the unadjudicat-ed robberies could not be used to undermine any mitigating circumstance, and he cites Cook v. State, 369 So.2d 1251 (Ala.1978) (plurality opinion), to support his contention. In Cook, the trial court considered a pending robbery charge against the defendant in according less weight to the mitigating circumstance of no significant history of prior criminal activity. 369 So.2d at 1253. A plurality of the Alabama Supreme Court stated that the trial court should not have considered the evidence of the pending robbery charge to undermine that mitigating circumstance. Cook, 369 *1130 So.2d at 1257. Similarly, in Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000), this Court cited Cook and held that the triál court improperly relied on the defendant’s alleged criminal activity to accord less weight to the mitigating circumstance of no significant history of prior criminal activity. 859 So.2d at 1146-47. See also Ex parte Burgess, 811 So.2d 617, 623 (Ala.2000) (holding that “[o]nly convictions can negate the statutory mitigating circumstance of no' significant history of prior criminal activity”).
In Carroll, the Alabama Supreme Court stated:
“We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the ‘triggerman’ or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.”
Carroll, 852 So.2d at 836 (footnote omitted).
In the present case, the trial court considered the evidence of the robberies and Lockhart’s military disciplinary record as additional facts that were unknown to the jury, and the court used those additional facts to undermine the mitigating circumstance of the jury’s recommendation. Unlike the situation in Cook, the trial court did not use the evidence of the robberies to negate or to accord less weight to the mitigating circumstance of no significant history of prior criminal activity. In fact, the trial court explicitly found that Lock-hart had no significant history of prior criminal activity, and the trial court did not mention the robberies in assigning weight to that mitigating circumstance. Therefore, there is no conflict with Cook.
Furthermore, contrary to Lock-hart’s contention in his brief, the present ease is distinguishable from Caroll and Ex parte Tomlin, 909 So.2d 283 (Ala.2003), in which the Supreme Court reversed the trial court’s override of the jury’s recommendation of life imprisonment without the possibility of parole because, at least in part, the trial court had justified its override based on an impermissible factor. In Carroll, the trial court justified its override based, in part, on the defendant’s incarceration for youthful-offender adjudications. 852 So.2d at 835-36. In Tomlin, the trial court justified its override based on the fact that “[t]he other perpetrator in this crime ... [was] sentenced to death.” 909 So.2d at 287. In each of those cases, the Alabama Supreme Court stated that the trial court justified its override based on an impermissible factor. In the present case, there is no indication that the trial court justified its override based on any impermissible factor. The trial court did not justify its override based on youthful-offender adjudications or the fact that another perpetrator was sentenced to death. Instead, the trial court justified its override based, in part, on Lockhart’s confession to a crime spree around the time he killed Burk. We find that such a factor is a permissible factor for the trial court to consider when weighing the jury’s recommendation as a mitigating circumstance.
*1131 Next, Lockhart contends that his due-process and confrontation rights were violated because, he says, he was not given a meaningful opportunity to challenge the evidence of the robberies. We note that, although Lockhart states in his brief that his confrontation rights and his due-process rights were violated, he does not make any specific argument concerning the Confrontation Clause.[5] Lockhart argues only that he did not have a meaningful opportunity to respond to the information concerning the robberies, which implicates his due-process rights. Lock-hart does not argue that he did not have the opportunity to confront any particular witness against him.
To support his argument, Lockhart relies on Lankford v. Idaho, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), in which the United States Supreme Court held that the defendant’s death sentence violated the Due Process Clause of the Fourteenth Amendment because, at the time of the sentencing hearing, the defendant and his counsel did not have notice that the judge might sentence him to death. The Court stated that “[n]otice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure” and that, “[wjithout such notice, the Court is denied the benefit of the adversary process.” Lankford, 500 U.S. at 126-27. The State responds that Lockhart had a meaningful opportunity to respond to the information regarding the robberies because it was contained in the presentence report, and he had the opportunity to respond to the report.
Section 13A-5-47(b), Ala.Code 1975, requires that a presentence report be prepared and considered by the trial court before sentencing in a capital case, and the statute gives the parties the right to respond to the presentence report. Lock-hart does not argue that he was denied his right to respond to the presentence report in the present case.
In the present case, the presentence report contained the following information concerning the robberies:
“On March 7, 2008 at approximately 9:55 AM, Newnan Georgia Police responded to a report of a possible car jacking in the parking lot of Wal-Mart, Bullsboro Drive, Newnan, Ga. The report, which is contained in the District Attorney’s file, indicates that a black male (later identified as Courtney Lock-hart) had robbed and assaulted an elderly female in the Wal-Mart parking lot in Newnan, Georgia. The report indicates that Scott O’Donnell told Newnan officers that he was in exiting his vehicle when he observed a black male walking toward him with a firearm. O’Donnell stated that he quickly got back into his vehicle and observed the male change directions and approach an elderly female, Marjorie Llewellyn. Llewellyn reported that she was attempting to get into her car after leaving Wal-Mart when she was hit in the back of the head by Lockhart and that he then stuck a firearm to the side of her head and told her he was going to kill her and take her money and car.
“Llewellyn stated that Lockhart shoved her into the passenger side floor board and that he then took her wallet *1132 and backed out of thé parking lot and attempted to leave. O’Donnell began to follow Lockhart in Llewellyn’s vehicle, and Lockhart then jumped from Llewellyn’s vehicle and got into a silver Chrysler. Wal-Mart loss prevention provided a tag number for Lockhart’s vehicle from surveillance tapes made during the robbery, kidnapping and assault. The tag on the vehicle returned as being registered to Lockhart with an address in Smith’s Station, Lee County, Ala-bama. Newnan police issued a lookout for this vehicle. Approximately 30 minutes after posting the lookout, Newnan police received a response from Phenix City, Russell County, Alabama Police.
[[Image here]]
“[During a police interview,] Lock-hart then confessed to committing a robbery in Columbus, Georgia in the parking lot of Sam’s Club. On March 6, 2008, Columbus Police Officers investigated armed robbery in the parking lot of Sam’s Club located at 5448 Whittlesey Blvd. The report indicates that Rachel Bucher reported to Columbus officers that she was robbed at gun point by a black male who pointed the gun at the head of her three year old child, Aiden Bucher. Bucher stated that the offender, later identified as Courtney Lock-hart, threatened to shoot her three year old son if she did not give him her purse. A' partial Alabama license plate registered in Lee County (43) was observable on the store’s surveillance video.
“Lockhart then confessed to committing the robbery in Newnan Georgia in the parking lot of Walmart, Lockhart admitted to getting into the victim’s vehicle and taking her purse. Lockhart advised the officers in his statement that the victim’s identification could be located in his vehicle.
“Lockhart then confessed to committing a robbery in Lee County, Alabama at the Short Stop located on at 7633 Lee Road 240 in Smiths, Alabama. The report regarding this incident indicates that on February 25, 2008, Deborah Franklin reported to the Lee County Sheriffs Department that an unknown black male entered the Short Stop Convenience Store where she was employed, displayed a silver revolver, and stated ‘give me the money.’ Franklin stated that after taking the money from the register, the male offender stated ‘give me the bag.’ Franklin stated that when she told the subject that she did not have a bag, he fired one shot at the cigarette counter and fled.
“Lockhart then confessed to committing a robbery in LaGrange, Georgia. A police report concerning this incident is contained within the District Attorney’s file. This report indicates that on March 5, 2008 at around 10:20 PM, La-Grange Georgia Detectives responded to a robbery in the parking lot of Florence Hand Nursing Home on Medical Center Drive in LaGrange, Georgia. The victim, Cinda Morrow, reported that she was walking toward her vehicle when she was approached by a black male who pointed a handgun toward her face and stated, ‘Give me your purse or you going to die.’ ”
(Supp. C. 10-11.)
In substance, that information is the same information that the trial court discussed in its sentencing order when it discussed the robberies as additional information that was unknown to the jury. (C. 1079-83.) “Notice and the opportunity to be heard are the ‘hallmarks of due process.’ ” M.L.R. v. State, 129 So.3d 307, 311 (Ala.Crim.App.2012) (quoting Anonymous v. Anonymous, 353 So.2d 515, 519 (Ala.1977)). The presentence report cer *1133 tainly gave notice to Lockhart that information concerning the robberies would be considered by the trial court during sentencing. Furthermore, Lockhart had the opportunity to respond to the information concerning the robberies. Therefore, because Lockhart was given notice and an opportunity to be heard concerning the robberies, we find that there is no conflict with Lankford and that Lockhart’s due-process rights were not violated by the trial court’s consideration of the information concerning the robberies.
Moreover, to the extent that Lockhart argues that the trial court erroneously considered information from the pretrial hearings rather than from the presentence report, we find that Lockhart’s due-process rights were not violated. During the sentencing'hearing before the trial court, the prosecutor stated:
‘Your Honor, I would ask the court in this sentence hearing again to make sure we have got it in the record to consider all the evidence presented to the court in the trial, the pretrial hearings, the 404(b) hearing regarding the Short Stop robbery, and the admissions made by the defendant to various law enforcement agencies, which I have marked as State’s Exhibit Number One for sentencing. These are the videos which the Court is aware of. And State’s Exhibit Number Two, which is a firearm’s report from Kathy Riehert which identifies the Short Stop bullet, anyway.”
(R. 4636-37.) Lockhart’s counsel explicitly responded that he had “no objection to those being admitted.” (R. 4637.) Therefore, we find that Lockhart had notice of and an opportunity to respond to the information from the pretrial hearings; thus, the trial court’s consideration of that evidence did ’ not violate his due-process rights.
Also, to the extent that Lockhart makes a general allegation that his rights under the Confrontation Clause were violated, we find no merit to his allegation. First, we express doubt that the Confrontation Clause applies at sentencing, even in capital cases. See Petric v. State, 157 So.3d 176, 234 (Ala.Crim.App.2013) (setting forth a detailed discussion of the applicability of the Confrontation Clause during capital sentencing and expressing doubt that the defendant has a right to confrontation during capital sentencing). Further, to the extent that Lockhart is challenging the information contained in the presentence report, in Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010), this Court held that hearsay evidence contained in a presen-tence report may be considered by the trial court at sentencing as long as the evidence is reliable and the defendant has an opportunity to respond to it. 72 So.3d at 108-10. Lockhart does not argue that the information in the presentence report concerning his confessions to the robberies was inaccurate, and, as noted earlier, he had an opportunity to respond to the pre-sentence report. Also, to the extent that Lockhart is making a Confrontation Clause challenge to the presentation at the pretrial hearings of his confessions to the robberies, we note that the Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right “to be confronted with the witnesses against him.” The evidence of Lockhart’s commission of the robberies was his own recorded confessions, not an accusation made by another. Further, Lockhart had the opportunity to confront the witnesses who presented the recordings of his confessions and to challenge the voluntariness of those confessions at the pretrial hearings. Therefore, to the extent that it is possible for the State to violate the Confrontation Clause at sentencing, we find no violation in the present case.
*1134 Additionally, Lockhart argues that the trial court’s consideration of the robberies constituted consideration of a nonstatutory aggravating circumstance, which is improper under Alabama law. However, as previously discussed, a review of the trial court’s sentencing order clearly shows that the court considered evidence of the robberies only to undermine the mitigating circumstance of the jury’s recommendation. (C. 1077-87.) There is no indication that the trial court considered the evidence of the robberies as a nonstatutory aggravating circumstance. Therefore, Lock-hart’s contention is without merit.
B.
Next, Lockhart argues that the trial court erroneously found that the full extent of his military disciplinary record was not known to the jury. According to Lockhart, “[t]he jury was well aware of the problems with Mr. Lockhart’s military service record, yet issued a life verdict anyway.” (Lockhart’s brief, at 62.) Accordingly, Lockhart argues that the information contained in the presentence report concerning his military disciplinary record could not have provided a proper basis for the trial court’s override of the jury’s recommendation. See Caroll, 852 So.2d at 886 (stating that “the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury”).
The trial court justified its override based, in part, on Lockhart’s military disciplinary record. In its sentencing order, the trial court stated that “[although the jury heard testimony regarding Lockhart’s service, the jury was unaware of the full extent of Lockhart’s military disciplinary record.” (C. 1088-84.) Citing the presen-tence report, the trial court noted that Lockhart was apprehended for being absent from the military without leave; that, while in the military, Lockhart was found guilty of bad conduct and sentenced to seven months incarceration for assaulting a noncommissioned officer; and that Lock-hart was dishonorably discharged from the military. (C. 1083.)
During trial, the jury heard the following testimony from Lockhart’s girlfriend:
“[Defense counsel]. Do you know what happened to [Lockhart] and his connection with the military?
“A. He was discharged.
“[Defense counsel]. And did he do time before he was discharged?
“A. Yes.
“[Defense counsel]. Do you know what kind of discharge he received?
“A. I am not sure.
“[Defense counsel]. And—
“A. I know what I think.
“[Defense counsel]. — he didn’t have - any V.A. benefits as a result of his military service, did he?
“A. No, he didn’t.
“[Defense counsel]. Didn’t receive any retirement?
“A. No.
“[Defense counsel]. Didn’t receive any money?
“A. No.
“[Defense counsel]. No — no card to get 'into the PX or the commissary?
“A. No.
“[Prosecutor]. What does doing time mean? You just answered a question about Mr. Lockhart doing time.
“A. It means being incarcerated.
“[Prosecutor]. Do you know why?
“A. No. I know what I think. I am not sure why.
*1135 “[Prosecutor]. Okay.”
(4204-05.)
That testimony is the full extent of the jury’s knowledge concerning Lockhart’s military disciplinary record.[6] The jury knew that Lockhart was incarcerated before he was discharged from the military. However, the jury did not know why Lock-hart was discharged. The jury was not told that Lockhart was found guilty of bad conduct and sentenced to seven months incarceration for assaulting a noncommis-sioned officer, nor was the jury specifically told that Lockhart was. dishonorably discharged from the military. Also, the jury did not know that Lockhart was apprehended for being absent from the military without leave. Therefore, contrary to Lockhart’s allegation, the trial court correctly found that “the jury was.unaware of the full extent of Lockhart’s military disciplinary record.” Because there is no factual basis in the record to support Lock-hart’s allegation, we find that his allegation is without merit.
C.
Next, Lockhart argues that the trial court failed to give the jury’s sentencing recommendation sufficient weight. The trial court stated that it considered the jury’s sentencing recommendation as a mitigating circumstance but that, “[i]n light of the other Carroll factors, especially the additional information unknown to the jury, the court finds that the great weight the court would otherwise place on the jury’s recommendation is substantially reduced.” (C. 1086-87.) The trial court recognized the factors listed in Carroll and noted how the present case differed from Carroll. The trial court noted that, in the present situation, unlike the situation in Carroll, there was no conflicting evidence concerning the identity of the “trigger-man,” several members of the victim’s family had asked that Lockhart receive the death penalty, and Lockhart had killed the only person that witnessed the crime. The trial court also noted that the jury’s recommendation was unanimous and stated that “this factor weighs against an override of the jury’s recommendation in this case in comparison to Carroll.” (C. 1078.)
This Court has recognized that the trial court may override a unanimous jury recommendation of life imprisonment without the possibility of parole if the trial court complies with the controlling appellate-court decisions, such as Carroll and Tomlin. In Doster, this Court stated:
“The Alabama Supreme Court has not held that a circhit court may never override a unanimous jury recommendation of life imprisonment without the possibility of parole. In fact, in Ex parte Jackson, 836 So.2d 979 (Ala.2002), the Supreme Court upheld a judicial override of a jury’s unanimous recommendation for life imprisonment without the possibility of parole and stated:
“Tn this case, before determining the sentence, the trial court considered all the available evidence; heard arguments on aggravating circumstances and mitigating circumstances; entered written findings ,of fact summarizing the offense and Jackson’s participation in it; made specific written findings concerning the existence or nonexistence of each aggravating *1136 circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; weighed the advisory verdict of the jury; considered and weighed the presentence-in-vestigation report; considered and independently weighed the mitigating circumstances and the aggravating circumstances; and stated specific reasons for giving the jury’s recommendation the consideration it gave the recommendation, see Ex parte Taylor [, 808 So.2d 1215 (Ala.2001)]. After following this procedure, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstance and imposed the death penalty, overriding the jury’s recommendation.
‘“We commend the trial court for its thorough sentencing order and especially for its explanation for its override of the jury recommendation. The trial court found two statutory aggravating circumstances: (1) that the capital offense was committed while Jackson was engaged in a robbery or an attempted robbery, and (2) that the capital offense was committed by a person under sentence of imprisonment. The trial court found one statutory mitigating circumstance: that Jackson was 18 years old at the time of the offense. It is evident from the trial court’s sentencing order that it independently weighed the aggravating circumstances and the mitigating circumstance. Additionally, the trial court provided a detailed analysis of its consideration of the jury’s recommendation of a sentence of life imprisonment without the possibility of parole and the reasons it rejected that recommendation and sentenced Jackson to death. There is no evidence in the record before us indicating that bias, passion, or prejudice were factors in the trial court’s imposing the death sentence.’
“836 So.2d at 990.
“Here, the circuit court properly found that the jury’s recommendation of life imprisonment without the possibility of parole was a mitigating circumstance that, based on the fact that the recommendation was unanimous was entitled to great weight. The court stated that it felt compelled to override the jury’s recommendation based on evidence that the jury was not privy to in reaching its recommendation. First, the circuit court noted that the court had access to Doster’s extensive criminal record. The court then noted that the jury was never informed what offense that Doster was convicted of and was serving his sentence for when he escaped from the Covington County jail, nor was the jury informed that Doster escaped a second time in 2005. The court then found that the jury was very emotional during sentencing, that Doster’s mother cried when she testified, that the court noticed that jurors were visibly upset, and that the jurors deliberated for only a few minutes after Doster’s mother begged them to spare her son’s life.
“After reviewing the circuit court’s very thorough order, it is clear that the circuit court meticulously complied with Alabama Supreme Court law when overriding the jury’s recommendation. Our review of the record also convinces this Court that although Doster was not the man who fired the fatal shot he was a major participant in the events leading to LeMaster’s death and even led Phillips to the site of the murder. The circuit court’s conclusions and findings negated the application of the mitigating circumstances that Doster had no signif *1137 icant history of prior criminal activity. and that Doster was an accomplice and that his participation was relatively minor—§§ 13A—5—51 (1) and 13A-5-51(4), Ala.Code 1975. The Supreme Court has held that these are valid considerations when overriding a jury’s recommendation of life imprisonment without the possibility of parole. See Tomlin. Also, we are not presented with a situation like Carroll where the court overrode a jury’s 10-2 recommendation for life imprisonment and the defendant had no significant criminal history and the victim’s family requested leniency. Nor is this case similar to the facts presented in Tomlin where the circuit court’s only explanation for overriding the jury’s unanimous recommendation for life imprisonment was that the defendant’s co-defendant had been sentenced to death. ‘We commend the trial court for its thorough sentencing order and especially for its explanation for its override of the jury recommendation,’ Jackson, 836 So.2d at 990, and find no valid legal basis to disturb the court’s override of the jury’s recommendation in this case.”
Doster, 72 So.3d at 119-20 (footnote omitted).
Likewise, in the present case, the trial court considered all the available evidence; heard arguments on aggravating circumstances and mitigating circumstances; entered written findings of fact summarizing the offense and Lockhart’s participation in it; made specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; weighed the advisory verdict of the jury; considered and weighed the presentence-investigation report; considered and independently weighed the mitigating circumstances and the aggravating circumstances; and stated specific reasons for giving the jury’s recommendation the consideration it gave the recommendation.
Furthermore, the trial court specifically found that the jury’s reeomméndation of life imprisonment without the possibility of parole was a mitigating circumstance and that, because the recommendation was unanimous, “this factor weighs against an override of the jury’s recommendation in this case in comparison to Carroll.” Thus, the trial court recognized that, without additional information known only to the trial court and not to the jury, the jury’s recommendation would carry even greater weight than the Carroll jury’s 10-2 vote for a sentence of life imprisonment without the possibility of parole, which the Ala-bama Supreme Court stated was “overwhelming • support” for such a sentence. 852 So.2d at 837. However, the trial court proceeded to detail evidence that the jury was not privy to in reaching its recommendation, including Lockhart’s military disciplinary record and his crime spree around the time he killed Burk, and to properly override the jury’s recommendation based on that evidence. Also, we are not presented with a 'situation like Carroll in which the trial court improperly justified its override based, in part, on the defendant’s incarceration for youthful-offender adjudications. See Carroll, 852 So.2d at 835-36. Nor, are we presented with a situation like Tomlin where the trial court improperly justified its override based on the fact that the other perpetrator in the crime was sentenced to death. See Tomlin, 909 So.2d at 287.
We have reviewed the trial court’s thorough sentencing order, including the court’s explanation for its override of the jury recommendation, and we conclude that the court complied with Alabama law *1138 when overriding the jury’s recommenda-' tion. There is no evidence in the record before us indicating that the trial court’s imposition of the death sentence was based on any impermissible factor. Therefore, we find no legal basis to disturb the trial court’s override of the jury’s recommendation.
VIII.
Next, Lockhart contends that his Eighth and Fourteenth Amendment rights were violated during the penalty phase of the trial because, he says, the trial court erroneously considered statements from the victim’s relatives requesting that he receive the death penalty. Lockhart did not make an objection based on this ground before the trial court; thus, we will review this issue for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
After the jury returned its unanimous sentencing recommendation of life imprisonment without the possibility of parole and was excused, the trial court held a sentencing' hearing in which some of Burk’s relatives gave unsworn statements to the court. Before the relatives gave their statements to the court, both parties and the trial court agreed that the court could not consider the statements as victim-impact evidence but that the court could consider the statements for the limited purpose of determining whether the victim’s family was recommending leniency. (R. 4595-96.) Burk’s father was the first relative to give a statement to the trial court, and he explicitly asked the court to sentence Lockhart to death. (R. 4639.) After Burk’s father gave his statement, defense counsel objected to allowing any additional family members to give statements. Defense counsel stated that he thought only Burk’s father was going to give a statement and that the trial court was well aware that the family did not want leniency. The trial court responded that it would allow other family members to give unsworn statements. Then, two of Burk’s aunts gave statements in which they asked the trial court to sentence Lockhart to death. (R. 4650, 4655.) Also, Burk’s mother gave a statement in which she stated that she opposed leniency for Lockhart. (R. 4652.)
In the trial court’s sentencing order, concerning the family members’ statements, the court stated:
“In Carroll, the victim’s family recommended that Carroll be sentenced to life without parole. At the sentencing hearing, several members of Burk’s family stated that they do not recommend leniency and in fact asked that Lockhart receive the death penalty.[20] This factor also weighs in favor of judicial override in comparison to Camll.
(C. 1078.)
The Alabama Supreme Court has stated:
“In Booth v. Maryland, 482 U.S. 496, 502, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court held that a defendant’s Eighth Amendment rights were violated by the sentencing authority’s consideration of any victim-impact evidence. In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court partially overruled Booth to allow the sentencing authority to consider evidence of the effect *1139 of the victim’s death upon family and friends. Payne, 501 U.S. at 830 n. 2, 111 S.Ct. 2597 (‘Our holding today is limited to the holdings of [Booth ] ... that evidence and argument relating to the victim and the impact of the victim’s death on the victim’s family are inadmissible at a capital sentencing hearing.’).”
Ex parte Washington, 106 So.3d 441, 445 (Ala.2011).
The Alabama Supreme Court has further stated that a trial court errs if it “consider[s] the portions of the victim impact statements wherein the victim’s family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment.” Ex parte McWilliams, 640 So.2d 1015, 1017 (Ala.1993). However, in Ex parte Land, 678 So.2d 224 (Ala.1996), the Alabama Supreme Court found that it was not plain error for the trial court when considering sentencing, to read letters from members of the victim’s family and from members of the defendant’s family, some of which expressed opinions as to the appropriate punishment, because those letters were read only by the trial judge and only “out of a respect for the families and for the limited purpose of possibly establishing a mitigating factor....” Land, 678 So.2d at 237.
Likewise, in the present case, the statements of the victim’s relatives were not presented to the jury, and the trial court explicitly stated that it considered the statements, only for the limited purpose of determining whether the victim’s family opposed leniency, which was a factor that was considered in Carroll to assign weight to the mitigating factor of the jury’s recommendation. Because the trial court carefully limited the purpose for which he considered the statements, Lockhart’s substantial rights were not adversely affected; thus, the trial court did not commit plain error.
IX.
Next, Lockhart argues that the trial court committed reversible error by failing to. suppress the handgun that was found after Lockhart was arrested. Before the trial court, Lockhart moved to suppress the handgun under the “fruit of the poisonous tree” doctrine. According to Lock-hart, the law-enforcement officers located the handgun based on information gleaned from an unconstitutional interrogation. The trial court denied Lockhart’s motion to suppress, finding that Lockhart had waived his Miranda rights before he gave a statement concerning the location of the handgun and that, in the alternative, the handgun was admissible under the inevitable-discovery exception to the exclusionary rule. On appeal, Lockhart argues that both of those findings were incorrect.
In Part VLA., supra, we found that Lockhart waived his Miranda rights before talking to Officer Lewis about the location of the handgun. Therefore, the trial court’s denial of Lockhart’s motion to suppress was not erroneous. .Furthermore, because we find that Lockhart waived his Miranda rights, we need not address the trial court’s alternative finding concerning the inevitable-discovery exception to the exclusionary rule.
X.
Next, Lockhart argues that the trial court erroneously denied his motion for a change of venue. Specifically, Lockhart contends that the community was so saturated with prejudicial pretrial publicity that no impartial jury could be selected and that the pretrial publicity created actual prejudice against him on the part of the jurors.
*1140 Before trial, along with his motion for a change of venue, Lockhart submitted numerous news articles concerning the crime, Burk, and/or himself. (C. 196-200, 268-589.) Many of the articles were taken from online news sources. After conducting a hearing, the trial court denied Lock-hart’s motion for a change of venue. (R. 994-1089; C. 644-45.) Shortly before trial, Lockhart amended his motion for a change of venue based on a recent news article that mentioned that he had been involved in other crimes. (R. 1341^13.) The trial court denied that motion, finding that Lockhart could ask the jurors appropriate questions concerning this subject during voir dire. (R. 1344:) After voir dire, Lockhart renewed his motion for a change of venue, arguing that 102 of the 117 potential jurors stated that they had some media exposure to this case. (R. 3225-29.) The trial court denied that motion, finding that only a few potential jurors stated that they could not put aside what they had heard about the case and that those few potential jurors had been removed for cause. (R. 3231-32.)
Lockhart notes that some of the news articles included information that was inaccurate and that some of the articles included information that was inadmissible at trial. Lockhart also notes that some of the online comments to the online news articles were inflammatory.
Under Rule 10.1(a), Alá. R.Crim. P., “[i]n any criminal case prosecuted by indictment or on appeal for trial de novo in which a jury is demanded, the defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and an unbiased verdict cannot be had for any reason.” Under Rule 10.1(b), Ala. R.Crim. P., “[t]he burden is upon the defendant tó show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.”
This Court has explained:
“ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
“ ‘The “actual prejudice” standard is defined as follows:
“ ‘ “To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and ‘rendered] a verdict based on the evidence presented in court.’ Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].”
“ ‘Coleman v. Zant, 708 F.2d at 544.
“ ‘... [The defendant] relies on the “presumed prejudice” standard an *1141 nounced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: “Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.” 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“ ‘In determining whether the “presumed prejudice” standard exists the trial court should look at “the totality of the surrounding facts.” Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is “rarely” applicable, and is reserved for only “extreme situations.” Coleman v. Kemp, 778 F.2d at 1537. “In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.” Coleman v. Kemp, 778 F.2d at 1490.’
“Hunt v. State, 642 So.2d 999, 1042-44 (Ala.Crim.App.1993).
“ ‘The burden of showing actual prejudice or community saturation with prejudicial publicity lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333 (1966). In addition, the appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors. Anderson v. State, 362 So.2d 1296 (Ala.Cr.App.1978); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865 (1985).’
“Hart v. State, 612 So.2d 520, 527 (Ala.Crim.App.1992).
“ ‘[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.’
“Nelson v. State, 440 So.2d 1130, 1132 (Ala.Crim.App.1983).'”
Scott v. State, 163 So.3d 389, 411-12 (Ala.Crim.App.2012).
Furthermore, in Woodivard v. State, 123 So.3d 989 (Ala.Crim.App 2011), this Court stated:
“Certainly the shooting of a Montgomery police officer during the course of a traffic stop and the arrest and upcoming trial of the accused shooter generated widespread media coverage. That fact, alone, however, could not support a finding of presumed prejudice. The media coverage, moreover, contained largely factual reports about the shooting and the events surrounding Officer Houts’s death and about the investigation and prosecution. The reports were not inherently prejudicial, inflammatory, or sensational. Furthermore, the publicity surrounding the case diminished substantially in the nearly two years between the shooting and the time of trial. ‘The passage of time tends to bring ob- *1142 jéctivity to a case in which there has been extensive pretrial publicity.’ Ex parte Fowler, 574 So.2d 745, 748-49 (Ala.1990).
“The presumptive-prejudice standard recognized in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is to be applied only in extreme situations in which a defendant can show that he or she cannot receive a fair trial because the community was so saturated with prejudicial pretrial publicity. Woodward did not make a showing that his case is in that rare category. We hold that the trial court did not abuse its substantial discretion when it denied Woodward’s motion for a change of venue.”
123 So.3d at 1050.
Also,
“unsolicited, unreviewed, largely anonymous online comments did not rise to the level of saturated, prejudicial media coverage. Moreover, we believe that any readers of the comments would value those comments at their true worth and not as ‘news coverage’ at all.”
Woodward, 123 So.3d at 1051; see also McMillan v. State, 139 So.3d 184, 243 (Ala.Crim.App.2010) (stating that, “[d]espite [the defendant’s] reference to certain unflattering comments made on blogs on certain Web sites, this alone did not require a change of venue”).
In the present case, Lockhart has failed to show that the trial court exceeded its discretion in denying his motion for a change of venue based on the totality of the surrounding facts. Lockhart has not démonstrated either presumed prejudice or actual prejudice.
Concerning presumed prejudice, a review of the news articles that were submitted by Lockhart shows that they were largely factual accounts and were not inherently prejudicial, inflammatory, or sensational. Also, regarding the online comments to the articles, we agree that some of those comments might have been inflammatory; however, those comments alone did not require a change of venue. The present case does not present an “extreme” situation in which the presumptive-prejudice standard would be applicable. Lockhart failed to carry his burden of showing presumed prejudice.
Concerning actual prejudice, Lockhart points to two jurors, V.M. and A.M., to support his contention. In response to questions during voir dire, V.M. initially indicated that she believed that Lockhart must be guilty of something because he was on trial and that Lockhart has to prove his innocence. A.M. also initially indicated a belief that Lockhart has to prove his innocence. Then, in response to an unrelated question, both jurors indicated that they had heard something about the case from the media. However, neither juror stated that their initial belief that Lockhart must be guilty of something because he is on trial or that Lockhart has to prove his innocence was related to what they had heard in the media. Thus, there is no evidence indicating that pretrial publicity affected their opinions concerning Lockhart’s guilt. Furthermore, Lockhart admits in his brief that both jurors testified that they could set aside what they had heard from the media. (Lockhart’s brief, at 89.) In fact, V.M. testified that she did not remember any of the details of what she had heard from the media. (R. 2067-68.) She also testified that she could be fair and impartial in this case and that she could follow the instructions of the trial court. (R. 2070, 2072-73.) Therefore, Lockhart failed to meet his burden of showing actual prejudice; thus, he has failed to establish any error concerning the trial court’s denial of his motion for a change of venue.
*1143 XI.
Next, Lockhart argues that the prosecution used its peremptory challenges in a racially discriminatory manner, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, Lockhart argues that the prosecutor’s race-neutral reasons for the challenges were merely a sham or pretext. Lockhart did not raise that specific argument in the trial court; thus, it will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
After the jury was struck, the defense made a Batson motion in which it argued that the State had used its strikes in a racially discriminatory manner. Specifically, the defense argued that from a panel of 40 veniremembers, the State struck 5 of the 8 black veniremembers and that, in particular, the State did not have a race-neutral reason for striking prospective juror 68. (R. 3270-73.) The defense noted that prospective juror 68 stated that he could consider a sentence of death. The defense also noted that prospective juror 68 had an uncle that was convicted of a crime, but the prospective juror believed that his uncle was treated fairly. The defense compared prospective juror 68 to juror 42, who was a white juror that was not struck and that had a “friend of the family or wife [who] was investigated dealing with DHR.” (R. 3272.) The State then made a reverse Batson motion, challenging the defense’s striking of white prospective jurors. The trial court then stated to both parties that, “[o]ut of an abundance of caution, I will have you put your reasons on the record.” (R. 3274.) The trial court further stated: “And there are several strikes here that I think is based on the reasons as to someone’s views on the death penalty, but I still think given the nature of the ease, it would be best to put the reasons on the record.” (R. 3274.)
The prosecution then gave the following reasons for its strikes of the black prospective jurors:
.“[Assistant District Attorney]: Your Honor, with regard to juror number 17, juror number 17 out of panel number 12 had a shoplifting conviction, and, in fact, that occurred in 2008. She indicated that she went to Juvenile Court for shoplifting and had taken a couple of shirts. She indicated that the death penalty was cruel and unusual punishment and that only God had the authority to impose death, and she was not sure if she could vote for the death penalty and would automatically vote for life without.
“With regard to juror 112, ... she had an arrest in 2008 through the Lee County Sheriffs Department for FTA on violation of a court order and also pled guilty to shoplifting as a youthful offender. Indicated that the death penalty was cruel and unusual punishment. Only God had the authority to do such. She also indicated that she was opposed to the death penalty. Did not approve of it, and was automatically against it. And the State’s challenge on 112 as well as number 17 were denied.
“Juror number 185, from panel number 24. Juror number 185 ... indicated that he did not like the death penalty, period. That he could not vote for the death penalty. It would be real hard, and that he would automatically vote for life without parole. The State’s challenge for cause was denied.
“Juror number 27, panel number 21, ... indicated that he had been accused while he was in the Army of falsifying paperwork to the government. He also indicated that there were several — lots of relatives — many relatives who were convicted of crimes. And that he indi *1144 cated also that his false accusal in the .Army — he indicated that the accusal for falsifying paperwork was, in fact, false, and that it resulted from an Army recruiter who indicated that he could list something on the paperwork that he, in fact, did, and he followed their instructions, but he was also, I believe, removed from his position or his rank at that time.
“[District Attorney]: He also had a sexual assault charge in the Army.
“[Assistant District Attorney]: He also indicated something that was not clear at the time about a possible sexual assault accusation when he was in the Army as well.
“Juror number 68, which is from panel number 20, ... indicated that he was neutral on the death penalty. He also indicated that he had an uncle who was convicted and served time for murder and has now been released from prison. But in regard to [defense counsel] — he also indicated that we did not strike number 42 ... who also said that they had been investigated by a state agency or DHR, which we clarified through detailed voir dire process that, in fact— that his ex-wife had called DHR regarding child support. It was not some accusation of criminal conduct. It related to child support only.
“The Court: All right. And so 68 dealt with the uncle being convicted of murder?
“[District Attorney]: Yes, sir.
“[Assistant District Attorney]: As well as his neutral feelings on the imposition of the death penalty.”
(R. 3275-78.)
The trial court then found that those reasons for removing the black prospective jurors were race neutral. (R. 3278.) After giving the reasons for its strikes, the defense objected to the trial court’s denial of the defense’s Batson motion, but defense counsel did not state any specific grounds for the objection. (R. 3286.)
This Court has stated:
“ ‘ “After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986)].”
“ ‘Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“ ‘ “Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’ Id. ‘[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly with *1145 in the trial judge’s province.” ’ Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.”
“ ‘Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).’
“Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
“1 “When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.” Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App. 2001). “A trial court is in a far better position than a reviewing court to rule on issues of credibility.” Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). “Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.” Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘ “Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will ‘largely turn on evaluation of credibility.’ 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.”
“ ‘Hernandez v. New York, 500- U.S. 352, 365 (1991).’
“Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010).
“ ‘[Wjhen more than one reason was given for striking some venire-members, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons. that might be suspect. See Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App.1989).’
“Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). ‘ “So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.” ’ Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
“ ‘Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.’ Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). ‘A determination regarding a moving party’s showing of intent to discriminate under Batson is “ ‘a pure issue of fact subject to review under a deferential standard.’ ” Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).’ Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’ Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).”
Thompson v. State, 153 So.3d 84, 123-24 (Ala.Crim.App.2012).
In Ex parte Branch, 526 So.2d 609 (Ala.1987), the Alabama Supreme Court stated:
“Other than reasons that are obviously contrived, the following are illustra *1146 tive of the types of evidence that can be used to show sham or pretext:
“1. The reasons given are not related to the facts of the case.
“2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
“3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck.
“4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors.
“5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the veni-re.
“6. ‘[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’ Slappy [v. State ], 503 So.2d [350,] 355 [ (Fla.Dist.Ct.App. 1987)]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
526 So.2d at 624 (citations omitted).
Also, “[t]o find plain error in the context of a Batson ... violation, the record must' supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’ ” Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987)). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App.2007) (holding that, “[f]or an appellate court to find plain error in the Batson context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges”).
In the present case, although the trial court did not find whether .a prima facie case of discrimination against prospective black jurors had been established, because the trial court instructed the State to articulate for the record its reasons for its strikes without making such a finding, our review will proceed as though a prima facie case was established. See Harris v. State, 705 So.2d 542, 545 (Ala.Crim.App.1997) (stating that “[w]here ... the trial court requires the opposing counsel to state reasons for the peremptory strikes without first requiring that a prima facie case of discrimination be established, this Court will review those reasons and the trial court’s ultimate decision on the Bat-son motion without determining whether the moving party met its burden of proving a prima facie case of discrimination”).
For the first time on appeal, Lockhart argues that the prosecution’s race-neutral reasons for. its strikes were merely a sham or pretext. Concerning prospective juror 68, Lockhart contends that persons with the same or similar characteristics as prospective juror 68 were not struck. The State indicated that it removed prospective juror 68 because he stated that he was neutral on the death penalty and because he had an uncle who was convicted of murder. Only one of those reasons must be race neutral for the strike to be race neutral, and we have held that “[t]he fact that a prospective juror has 'a relative who has been convicted of a crime is a race-neutral reason for a peremptory strike.” Jackson v. State, [Ms. CR-07-1208, March 29, 2013] — So.3d -, - (Ala.Crim.App.2010) (opinion on return to remand). Thus, the fact that prospective juror 68 had an uncle who was convicted of murder was a race:neutral reason for the State’s strike. Lockhart *1147 argues that that reason- was a pretext because, he says, white jurors 102 and 109 had the same or similar characteristics as prospective juror 68 but were not questioned about those characteristics by the State and were not struck. To support his argument, Lockhart points out that, during panel voir dire, jurors 102 and 109 • indicated that they had a close friend or family member that had been accused of a crime. (R. 1668-69.) Furthermore, during individual voir dire, defense counsel asked juror 102 about his indication on his jury questionnaire that he had a close friend or relative that had been convicted of a crime. Juror 102 explained that his brother-in-law had been convicted of manufacturing methamphetamine. (R. 2334-35.) This Court finds that those facts alone do not show that the State engaged in disparate treatment in the present case. There is no indication in the record before us that juror 109 indicated that she had a family member that was convicted of a crime, and we find that having a family member that is convicted of a crime is categorically different than having a friend or family member that is merely accused of a crime. Concerning juror 102, we find that, in a capital-murder case, having a family member that was convicted of the manufacture of methamphetamine is categorically different than having a family member that was convicted of murder. Thus, based on the record before us, there is nothing to indicate that it was necessary for the State to question jurors 102 or 109 any further about these subjects or that the State engaged in disparate treatment of prospective juror 68 when compared to jurors 102 and 109. Therefore, the record does not provide any basis for us to find plain error concerning the State’s strike of prospective juror 68.
Concerning prospective juror 17, Lockhart argues that the State struck ■her based on a juvenile shoplifting charge and that this reason was a pretext because, he says, the State failed to connect this reason to the case at hand. However, that reason is not the only reason given by the State for striking prospective juror 17. The State also stated that it struck prospective juror 17 because she indicated that she had reservations about the imposition of the death penalty. In his brief, Lockhart does not even mention that reason asserted by the State for striking prospective juror 17.
•“ ‘Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes.... ’ Acklin v. State, 790 So.2d 975, 988 (Ala.Crim.App.2000). See also Mashburn v. State, 7 So.3d 453 (Ala.Crim.App.2007), and Hocker v. State, 840 So.2d 197 (Ala.Crim.App.2002). ‘Although a juror’s reservations about the death penalty may not be sufficient for a challenge for cause, his [or her] view may constitute a reasonable explanation for the exercise of a peremptory strike.’ Johnson v. State, 620 So.2d 679, 696 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993).”
Martin v. State, 62 So.3d 1050, 1062 (Ala.Crim.App.2010).
Furthermore,
“[i]t is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.CrimApp.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). ‘Where a prosecutor gives a *1148 reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ Battle v. State, 574 So.2d 943, 949 (Ala.Crim.App.1990).”
Martin, 62 So.3d at 1059-60.
Lockhart does not argue and there is no indication in the record that the State’s striking of prospective juror 17 based on her reservations about the imposition of the death penalty was a sham or a pretext. Therefore, we need not make a determination concerning any other reason given by the State.
Likewise, concerning prospective juror 112, Lockhart argues that the State struck her based on her 2008 arrest for failing to appear in court and her youthful-offender shoplifting conviction and that those reasons were a pretext because, he says, there was a lack of questioning to prospective juror 112 concerning those reasons. However, as with prospective juror 17, those reasons were not the only reasons given by the State for striking prospective juror 112. The State also stated that it struck prospective juror 112 because she indicated that she had reservations about the imposition of the death penalty. Again, in his brief, Lockhart does not even mention that reason asserted by the State for striking prospective juror 112. As with prospective juror 17, there is no indication in the record that the State’s striking of prospective juror 112 based on her reservations about the imposition of the death penalty was a sham or a pretext. Therefore, we need not make a determination concerning any other reason given by the State.
Concerning prospective juror 27, the State indicated that it struck him because he had been accused of falsifying paperwork and of sexual assault while in the Army and because he had family members who had been convicted of crimes. Lockhart argues that those reasons were a pretext because, he says, the State failed to ask meaningful questions to prospective juror 27 concerning those reasons. However, the record shows that the prosecutor did ask meaningful questions to prospective juror 27 concerning the accusations that he falsified paperwork and committed sexual assault while in the Army. During individual voir dire, the following exchange occurred:
“[Prosecutor]: ... I don’t mean to embarrass you at all, but you mentioned that apparently you were put on trial for something—
“[Prospective juror 27]: Yes.
“[Prosecutor]: — while you were in the Army?
“[Prospective juror 27]: Yes.
“[Prosecutor]: Do you mind sharing that?
“[Prospective juror 27]: It was — it wasn’t rape. It was like sexual assault, but later she said she — she didn’t remember — it was at AIT. And then she said nothing happened, but at the same time I was having problems with me and ankle. I played football at Troy, and when I went to the Army because my son came along, when I was being recruited I told the recruiter, you know, I had had my knee scoped and my ankle scoped and he said don’t worry about it. But you don’t run 10, 15 miles and then when you get to the Army, then you have a problem with your knees and ankles, and they say well, you didn’t say anything about it. Well, the recruiter said don’t worry about it. So then they say, well, he falsified paperwork, so—
“[Prosecutor]: Did that put you out of the Army?
“[Prospective juror 27]: Yes.
“[Prosecutor]: Is that what you’re saying?
*1149 “[Prospective juror 27]: Yes.
“[Prosecutor]: Do you feel like that was fair?
“[Prospective juror 27]: Well, I sit back and I think and I think it was for the best, so—
“[Prosecutor]: It wasn’t really fair, was it?
“[Prospective juror 27]: I am sorry — I am sorry, but it — growing up when I grew up ain’t nothing in life fair. So— so you learn to put it behind you and you keep going.
“[Prosecutor]: All right. Thank you....”
(R. 2920-22.)
The record also shows that earlier during individual voir dire prospective juror 27 explicitly stated, among other things, that he had “a lot of close relatives that [had been] convicted of a crime” and that he did not want to be on the jury because he had been falsely accused of a crime earlier in his life. (R. 2916-18.) Therefore, contrary to Lockhart’s allegation, prospective juror 27 was asked meaningful questions concerning the reasons asserted by the State for striking him. Based on our review of the record, we find that the reasons asserted by the State for striking prospective juror 27 were based on something other than his race and that the reasons were not a sham or pretext.
Concerning prospective juror 185, the State indicated that it struck him because he indicated that he had reservations about the imposition of the death penalty. Lockhart argues that that reason is unsupported by the record.
During individual voir dire of prospective juror 185, the following exchange occurred:
“[Prosecutor]: If you were selected to serve as a juror on this case, if the law— let me ask you this way: If you were selected as a juror and you the other 11 jurors determine from the evidence that the Defendant was guilty of capital murder, would you, yourself, vote to recommend the death penalty?
“[Prospective juror 185]: No. I couldn’t do it myself.
“[Prosecutor]: You couldn’t vote for the death penalty?
“[Prospective juror 185]: No. I couldn’t do it.
“[Prosecutor]: Under no circumstances even with the instructions of the Court and the law, you still could not vote for the death penalty?
“[Prospective juror 185]: It would be real hard for me. Yes. It would be.
“[Prosecutor]: You would automatically vote for the life without the possibility of parole?
“[Prospective juror 185]: Yes. I would. I probably would. Being who I am, I would. Yes. Yes, sir.
“[Prosecutor]: Are there any circumstances where you feel like you would vote for the death penalty?
“[Prospective juror 185]: Yes, sir. I mean, like I said, death is always around. It just bothers me, period. Just — 1 don’t even like the word death, you know, but like you say — and like I say what is right is right and what’s wrong is wrong.
“The Court: ... in this — when y’all were sitting out there as part of the big panels, I went over a charge with y’all and basically we would have a two phase trial, or could have a two phase trial. The first phase would be what’s referred to as the guilt or innocence phase. And the jury would have to determine whether the Defendant is guilty of the offense of capital murder. Now, if there is a finding of guilt, then we would go into another phase referred to as the sen *1150 tencing phase, and the jury would listen to what’s referred to as aggravating circumstances or evidence from the State, and during that process, the District Attorney’s Office and the State would be trying to convince the jury that they should return a recommendation of the death penalty. Likewise, the defense could put on evidence during that phase in what’s called mitigating circumstances. Then they would be trying to get the jury to have a recommendation back to the Judge of life imprisonment without the possibility of parole. . And the question basically is: Could you simply listen to both sides and consider both alternatives or would you just automatically vote for one or the other?
“[Prospective juror 185]: I would listen to both sides.,
“The Court: Okay.
“[Prospective juror 185]: I would listen to both sides.
“The Court: Okay.
“[Prospective juror 185]: Right.
“The Court: All right. Any other questions?
“[Prosecutor]: Could I ask you one more time: Could you personally vote to impose the' death penalty?
“[Prospective juror 185]: Could I vote?
“[Prosecutor]: Yes.
“[Prospective juror 185]: It would be hard, but if I had to do what I have to do, I would do what I got to.
“[Prosecutor]: Does that mean yes?
“[Prospective juror 185]: Like I said, it would be hard. It would be very hard. It would be very hard. I mean, you are talking about a life here. So it would be — whew.
“[Prosecutor]: I understand it would be hard. Can you answer yes or no?
“[Prospective juror 185]: I am going to have to say no.
“[Prosecutor]: You couldn’t do it?
“[Prospective juror 185]: I couldn’t do it. I couldn’t be the one to do it, you know.
“[Prosecutor]: 'Thank you.
“[Defense counsel]: ... you have heard the Judge indicate to you that if there is a finding of guilty of capital murder in this case we are going to go to another phase of the trial. It’s a mini trial, if you will. You and the same jurors, y’all have to decide whether to recommend life without the possibility of parole—
“[Prospective juror 185]: Okay.
“[Defense counsel]: — or the death penalty.
“[Prospective juror 185]: Right.
“[Defense counsel]: Y’all have to decide that. You are going to hear evidence from the State. You are going to hear evidence from us.
“[Prospective juror 185]: Right.
“[Defense counsel]: We are going to be trying to get life without parole.
“[Prospective juror 185]: Right.
“[Defense counsel]: And they are going to be trying to get death.
“[Prospective juror 185]: Right.
“[Defense counsel]: And the Judge will instruct you it’s your duty as a juror, you take an oath that you have to consider both of those options.
“[Prospective juror 185]: Right.
“[Defense counsel]: I know it’s difficult for you.
“[Prospective juror 185]: Right.
“[Defense counsel]: And you wouldn’t want to give the death penalty, but could you consider both of those options and consider the evidence as the Judge instructions you?
*1151 “[Prospective juror 185]: Yes, I could.
“[Defense counsel]: That’s all I am going to have.
“The Court: So — and again ... we are not trying to pick on you, and I know they are tough questions, but are you — are you telling the Court that you could consider both alternatives and would not automatically vote against the imposition of the death penalty; that under certain circumstances you think you could actually vote for the death penalty?
“[Prospective juror 185]: Under certain — yes. Under certain — under certain.
“The Court: Okay. All right. I understand you are leaning maybe right now to voting for life in prison without the possibility of parole, but under certain circumstances you could vote for the death penalty if the evidence warranted such? ■
“[Prospective juror 185]: Under certain. Under certain.
“The Court: Okay. Okay. Thank you, sir.”
(R. 3140-47.)
After that exchange, the State challenged prospective juror 185 for cause, but the trial court denied that challenge. (R. 3147-48.)
Contrary to Lockhart’s allegation, the record clearly supports the State’s strike of prospective juror 185 based on his reservations about the imposition of the death penalty. At the end of his voir dire, prospective juror 185 stated that, under certain circumstances, he thought he could vote for the death penalty; however, moments earlier, he stated, among other things, that he could not vote to impose the death penalty and that he would automatically vote for life imprisonment without thé possibility for parole. As noted earlier, mixed feelings or reservations about the imposition of the death penalty is a valid reason for a peremptory strike, even if those reservations may not be sufficient for a challenge for cause. See Martin, supra. After reviewing the record, we conclude that the reason provided by the prosecutor for striking prospective juror 185 was race neutral and that it was not a sham or pretext.
Also, we note that in a footnote Lock-hart states:
“The State also exercised its final peremptory strike against [prospective juror 154], the only other minority venire-member. Although trial counsel did not specifically include this strike in his Bat-son motion, the strength of the prima facie case also applies to this challenge, and this Court should remand for the State to offer race-neutral reasons for its strike.”
(Lockhart’s brief, at 93 n.26.)
Prospective juror 154 was a male whose race is unclear from the record. On the jury strike list, the race of prospective white jurors is listed as “W” and the race of prospective black jurors is listed as “B.” Prospective juror 154’s race is listed as “X.” In any event, Lockhart admits that prospective juror 154 was not included in his Batson motion concerning the State’s striking of black jurors; thus, this Court should remand this case for the State to offer a race-neutral reason for striking prospective juror 154 only if the record establishes plain error, i.e., the record establishes an inference that the prosecutor engaged in the practice of purposeful discrimination against a class of people that would include prospective juror 154. We have examined the record, and we find that the record establishes no süch inference.
*1152 XII.
Next, Lockhart argues that the State violated Rules 403 and 404(b), Ala. R. Evid., by presenting evidence of injuries sustained by police officer Dale Richards during Lockhart’s arrest. According to Lockhart, that evidence served no purpose other than to prejudice the jury. Lock-hart did not raise this issue in the trial court; thus, it will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
Three days after Lockhart killed Burk and immediately before he' was arrested, he led police on a high-speed chase in his vehicle. Officer Richards testified that on March 7, 2008, he observed a traffic stop in which another officer had stopped Lock-hart. During that stop, Lockhart got into an altercation with the other officer, and then Lockhart fled in his vehicle. Officer Richards pursued Lockhart on a police motorcycle. After Officer Richards had pursued Lockhart for several miles and had reached speeds of up to 100 miles per hour, Lockhart abruptly stopped his vehicle and opened the driver’s side door of the vehicle. Officer Richards testified that he hit the driver’s side door with his motorcycle. His body then went over the handle bars of the motorcycle and landed on the ground. Lockhart then exited his vehicle and began to run. According to Officer Richards, he attempted to chase Lockhart, but the pain was so excruciating he had to stop after about 40 yards. Officer Richards pointed other officers in the direction that Lockhart fled. Those other officers apprehended Lockhart and recovered an iPod that was in his possession and that later was determined to belong to Burk. At trial, the State introduced seven photographs representing the scene where Officer Richards crashed his motorcycle and the injuries he sustained in the crash. (R. 3726; C. 904-24.) Defense counsel stated that he had no objection to the admission of those photographs, and he did not object to Officer Richards’s testimony. (R. 3726.) The photographs included a picture of a minor cut on Officer Richards’s forehead, a picture of Officer Richards grimacing in pain, a picture of road rash on Officer Richards’s elbow, a picture of the vehicle that Officer Richards crashed into, a picture of the front windshield of his police motorcycle, and two pictures of his crashed police motorcycle. (R. 3727-30; C. 904-24.)
“Relevant evidence” is defined as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid. Under Rule 402, Ala. R. Evid., “[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.” Rule 403, Ala. R. Evid., provides that, “[ajlthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
Furthermore, Rule 404(b), Ala. R. Evid., the general exclusionary rule, provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the *1153 accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
In Doster, this Court stated:
“Alabama has long recognized the following exceptions to the general exclusionary ' rule now contained in Rule 404(b), Ala. R. Evid.:
“! “These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes.” ’
“Scott v. State, 353 So.2d 36, 38 (Ala.Crim.App.1977), quoting Wharton’s Criminal Evidence, § 31.
“As Professor Charles Gamble explained:
“ ‘Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term ‘res gestae’ because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the ‘complete story’ of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“ ‘Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute “other crimes, wrongs, or acts” as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — i.e., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.’
“C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed.1996) (footnotes omitted).
‘[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscrip *1154 tion against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[t]ell the complete story so as not to confuse the jury.” ’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.’); People v. Shall, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“‘The ‘complete story’ exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence actually presented seems improbable or incredible.’).
“As we stated in Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997):
“‘We agree with the trial court’s ruling in receiving evidence of collateral offenses under the above exceptions. “The two crimes are intertwined and connected to such an extent that they form one continuous transaction.” Bush [v. State], 695 So.2d [70,] 86 [(Ala.Crim.App.1995)]. C. Gamble, McElroy’s Alabama Evidence, § 70.01(12)(b) (5th ed.1996), in regard to the res gestae exception, states, “The prosecution may prove the accused’s commission of collateral crimes, wrongs or acts if the evidence warrants a reasonable inference that such , other crime was a part of the same transaction as the now-charged homicide.”
“ ‘The appellant’s foremost argument regarding this issue does not dispute the exceptions to the general exclusionary rule, but rather, argues *1155 that the “common plan or scheme” exception does not apply to this particular capital offense. Specifically, he argues that because 12 hours had elapsed between the two murders, the act could not be part of one “common plan or scheme.” We disagree.
“ ‘In Ex parte Windsor, 683 So.2d 1042, 1053 (Ala.1996), the Alabama Supreme Court stated:
“ ‘ “The robbery and murder of Rayford Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar. Therefore, the trial court did not err in admitting evidence regarding Windsor’s participation in the robbery and murder of Randall Earl Pepper.”
“ ‘See also Guthrie v. State, 616 So.2d 914 (Ala.Cr.App.1993).
“‘The Alabama Supreme Court in Windsor created no time limitation. The facts of this case clearly establish that the collateral capital offenses were part of a continuous crime spree.’
“705 So.2d at 859-60.”
Dosier, 72 So.3d at 87-89.
In the present case, contrary to Lockhart’s contention, Officer Richards’s testimony and the photographs that were admitted during his testimony were relevant and admissible to show events contemporaneous with the charged crime. The events portrayed through Officer Richards’s testimony and the accompanying photographs were inseparably connected with the charged crime and showed the “complete story” of the charged crime. These events, which happened only a few days after Lockhart killed Burk, helped explain how Lockhart was eventually apprehended, how the police obtained an iPod in Lockhart’s possession that belonged to Burk, and how the police obtained Lockhart’s vehicle, which contained evidence linking him to Burk’s death. Furthermore, any prejudice caused by evidence of the relatively minor injuries received by Officer Richards during his pursuit did not substantially outweigh the probative value of the evidence. Lockhart has not established that admission of the evidence constituted an obvious, indisputable error or that any error in the admission of the evidence adversely affected the outcome of the trial; thus, we find that the trial court did not commit plain error by allowing the admission of Officer Richards’s testimony and the accompanying photographs.
XIII.
Next, Lockhart argues that the admission of evidence regarding the “trigger pull” of the handgun that fired the shot that killed Burk violated Rules 702 and 403, Ala. R. Evid. Specifically, Lockhart argues that that evidence was inadmissible because, he says, Katherine Richert was not qualified to testify about the trigger pull and the results of her trigger-pull tests were unreliable. Lockhart further argues that, because Richert was unqualified and the results of her tests were unreliable, the probative value of her testimony was substantially outweighed by the danger of unfair prejudice. Lockhart did not raise these issues in the trial court; thus, they will be reviewed for plain error only. See Rule 45A, Ala. RApp. P.; Wilson, supra.
One theory that Lockhart pursued at trial was that he accidentally fired the gunshot that killed Burk. At trial, Ric-hert, a forensic scientist specializing in firearms and toolmarks examination for the Alabama Department of Forensic Sci- *1156 enees, was offered and accepted as an expert in that field without any objection from the defense. (R. 4036-37.) Concerning the trigger pull of the handgun that fired the shot that killed Burk, Richert testified that
“trigger pull is the amount in pounds of pressure that it takes to pull the trigger to the rear. We test this by a device that’s similar to weighing a fish or weighing fruit in the grocery store. Essentially, the trigger — the mechanism is engaged in the trigger, and then the firearm is pulled down until the trigger or the hammer engages the firing mechanism. In this particular firearm, the single action trigger pull was five pounds and the double action trigger pull was an average of 12 pounds.[7] We check many — up to three or up to five trigger pulls and take an average within a pound of what the trigger pull is.
“[Prosecutor]: And just something that everybody could relate to, you are talking about — a five pound trigger pull, you are talking about the weight of a five pound bag of sugar? Is that correct?
“[Richert]: That would be five pounds. Yes, sir.”
(R. 4044-45.)
On cross-examination, Richert testified that she had been “competency tested” to ensure that she knew how to perform a trigger-pull analysis correctly, but she had not been “proficiency tested,” which consists of a second examiner’s performing the same tests as the first examiner and verifying the results. (R. 4050-52.)
Concerning the qualifications of an expert witness, this Court has stated:
“A witness may be qualified as an expert by evidence of that person’s ‘knowledge, skill, experience, training, or education’ in the area of expertise. Rule 702, Ala. R. Evid. The determination of whether a person is qualified to testify as an expert is well within the discretion of the trial court; we will not disturb the trial court’s ruling on that issue unless there has been an abuse of that discretion. See Bailey v. State, 574 So.2d 1001, 1003 (Ala.Crim.App.1990). Moreover, a challenge to the qualifications of an expert go to the weight, not the admissibility, of the expert’s testimony. See Smoot v. State, 520 So.2d 182, 189 (Ala.Crim.App.1987).”
Kennedy v. State, 929 So.2d 515, 518 (Ala Crim.App.2005).
Furthermore, “an expert witness is one who can enlighten the jury more than the average man on the street, one whose knowledge extends beyond or supersedes that of an ordinary witness, or one who is shown, either by training or experience, to be better informed than a hypothetical average juror.” Bailey v. State, 574 So.2d 1001, 1003 (Ala.Crim.App.1990).
In the present case, Richert testified that she is the laboratory director of the Montgomery laboratory for the Ala-bama Department of Forensic Sciences. She further testified that she is a forensic scientist specializing in firearms and tool-marks examination; that she has an undergraduate degree from the University of Alabama in Birmingham; that she trained for two and a half years within the Ala-bama Department of Forensic Sciences in the examination of firearms and toolmarks evidence; that she has attended 2 one-week courses operated by the California Criminalist Institute; that she has attend *1157 ed 13 one-week training seminars operated by the Association of Firearms and Tool-marks Examiners; that she has attended the F.B.I. Firearms Instructors School; and that she is a certified instructor in rifles, pistols, and shotguns by the F.B.I. (R. 4035.) Nevertheless, although Richert had been “competency tested” to ensure that she knew how to perform a trigger-pull analysis correctly, Lockhart argues that Richert was not qualified to testify concerning the results of her trigger-pull analysis because her trigger-pull analysis had never been “proficiency tested.” According to Lockhart, “there is no guarantee that [Richert’s] methodology and conclusions were reliable” because she “had never conducted a trigger-pull test in which her work was formally double-checked by another examiner.” (Lock-hart’s brief, at 104.)
Contrary to Lockhart’s assertion, the trial court could certainly find that, based on her qualifications, Richert could enlighten the average juror concerning the trigger pull of a firearm more than an average person on the street and that Richert’s knowledge concerning the trigger pull of a firearm extends beyond that of an ordinary witness. This Court has previously found that a trial court did not err in allowing the .state toxicologist, who stated that part of his duties were to test and examine firearms and that he had considerable experience and training in this area, to give expert opinion testimony that the alleged murder weapon required “more than an average pull on the trigger” and that “it would be difficult for it to be fired accidentally.” Boswell v. State, 339 So.2d 151, 155 (Ala.Crim.App.1976). Similarly, in the present case, we cannot say that the trial court exceeded its discretion or committed plain error by allowing an unquestionably qualified expert in firearms and toolmarks examination, who had been “competency tested” to ensure that she knew how to perform a trigger-pull analysis, to testify concerning the trigger pull of a firearm simply because her trigger-pull testing had never been “double-checked” by another expert. We conclude that Lockhart’s argument concerning Richert’s qualifications goes to the weight of her testimony, not the admissibility. Thus, this issue does not warrant reversal.
Next, Lockhart argues that the trigger-pull analysis was unreliable because, he says, the State failed to lay a proper foundation for the admission of the analysis. Specifically, Lockhart argues that the State did not prove a proper chain of custody for the firearm because, he says, “at some point, the gun became inoperable and the State did not show whether this happened before, during, or after Ms. Ric-hert’s testing of the gun.” (Lockhart’s brief, at 106.) However, Lockhart’s factual allegation that the “gun became inoperable” is simply not supported by the record.
Lockhart bases his contention on the following exchange that occurred during cross-examination of Richert:
“[Defense counsel]: Okay. Now, I .think you indicated to [the prosecutor] that that weapon there — if you will' take a look at it again. Is that weapon in the same or similar condition today as it was when you received it?
“[Richert]: Other than me placing my markings on it, essentially, yes, sir.
“[Defense counsel]: Okay. And did at any time when you test fired that weapon, did you open the cylinder?
“[Richert]: Yes, sir, I would have had to have opened the cylinder.
“[Defense counsel]: All right. Can you open that cylinder today?
“[Richert]: I already tried to do that a moment ago.
“[Defense counsel]: And you couldn’t do that, could you?
*1158 “[Richert]: Not here with my — with my bare hands, no.
“[Defense counsel]: Well, did you use your bare hands then to open it?
“[Richert]: I couldn’t tell you that; it was not documented.
“[Defense counsel]: Okay. So it’s possible you maybe used some — some tool to open the cylinder. Is that correct?
“[Richert]: Basically, I am not real sure, basically, with this particular firearm; a lot of times when I have to open the cylinder on it, if it doesn’t catch like that, I would just pop it on a rubber mat and it will pop right out. But if it was too difficult to open, for some reason, it would have been notated if there were any parts missing or any issues with it..
“[Defense counsel]: But you don’t recall what you notated?
“[Richert]: There were none notated.”
(R. 4068-69.)
The fact that Richert could not open the cylinder of the firearm with her bare hands at trial does not show that the “gun became inoperable” or even that the cylinder could no longer be opened. It is not clear from the record whether Richert could ever open the cylinder with her bare hands. Furthermore, concerning the disputed subject of Richert’s testimony, i.e., the trigger pull, Richert actually demonstrated for the jury the functionality of the single-action trigger pull and the double-action trigger pull of the firearm. (R. 4043-44.) There is simply no factual basis in the record to support Lockhart’s contention that the “gun became inoperable” before trial, much less a basis that would support a finding of plain error.
Moreover, the 'State properly established the chain of custody for the firearm.[8] “In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ ” Ex parte Holton, 590 So.2d 918, 920 (Ala.1991) (quoting McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988)).
Officer Greg Lahr testified that he recovered the firearm from the area around the Publix supermarket and that he gave the firearm to Ray Smith of the Lee County Sheriffs Department in substantially the same condition as it was found. (R. 3830.) Ray Smith testified that he received the firearm in a sealed condition from Officer Lahr and that he gave it to the Alabama Department of Forensic Sciences in the same condition that it was given to him. (R. 3975-76.) Richert testified that she received the firearm from Ray Smith of the Lee County Sheriffs Department and that, after examining the firearm, she gave it to Detective Randy Armstrong in the same condition it was in when she received it except for some markings she had placed on the firearm. (R. 4037.) Detective Armstrong testified that he received the firearm in a sealed condition from the Alabama Department of Forensic Sciences and that it remained in that condition until trial. (R. 4024.)
We find that Richert’s testimony concerning her inability to open the cylinder with her bare hands at trial does not ne *1159 gate the other testimony showing that, when introduced at trial, the firearm was in substantially the same -condition as its condition at the commencement of the chain of custody. Therefore, the record does not reveal any error, plain or otherwise, concerning the chain of custody of the firearm or the admission of Richert’s testimony concerning the trigger pull of the firearm.
Furthermore, contrary to Lock-hart’s contention, we conclude that the probative value of Richert’s testimony concerning the trigger pull of the handgun was not substantially outweighed by the danger of unfair prejudice. Considering Lockhart’s factual assertion at trial that the gun accidentally fired, Richert’s testimony made the existence of that fact much less probable than it would have been without her testimony. Furthermore, we see no unfair prejudice from the admission of Richert’s testimony. Lockhart’s allegation of unfair prejudice hinged on his contentions that Riehert was unqualified and that the results of her tests were unreliable. We have found both of those contentions to be without merit. Therefore, we find that no violation of Rule 403, Ala. R. Evid., occurred.
XIV.
Next, Lockhart argues that the trial court erroneously allowed prejudicial victim-impact evidence and improper comments by the prosecutor during the guilt phase of the trial. Specifically, Lockhart argues that the trial court erred when it allowed Burk’s father to make certain positive comments about Burk and to identify a photograph of Burk that depicted her as she appeared in the months preceding her death. Lockhart also argues that the trial court erred when it allowed two comments about Burk by the prosecutor during closing argument. Lockhart did not object to any of these comments or to the admission of the photograph; therefore, we review this claim for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
At trial, the prosecutor asked Burk’s father whether Burk was a student at Auburn University in March 2008. Burk’s father responded: “She was an excellent student. She was a shining star. She had a lot of potential.” (R. 3466.) Later, the prosecutor asked Burk’s father about going to East Alabama Medical Center to identify Burk on the night she was killed. Burk’s father responded:
“[W]e followed [Tommy Dawson] to East Alabama Medical Center. They made us wait out there for 10 minutes. We finally got in there. They led me courteously to where she was. She was lying in a gurney with a white sheet up to her neck like she was sleeping like an angel.' I looked at her. I said,.oh, my God. I kissed her forehead. And then I just left.”
(R. 3468-69.)
The prosecutor also showed Burk’s father a photograph and asked him whether it accurately depicted Burk as she appeared in the months preceding her death. Burk’s father responded:
“Yes. She was a happy girl. She was an angel. She never wanted to even hurt a fly. She always looked on the bright side of things. She was an A student. She traveled the world. She loved rock and roll.... She lost her whole future.”
(R. 3470.)
That photograph was then admitted into evidence without any objection from the defense.
In Woodward v. State, 123 So.3d 1014 (Ala.Crim.App.2011), this Court stated:
“Woodward next argues that the trial court erred when it allowed Officer *1160 Houts’s widow, Ashley Houts, to testify extensively about her husband’s background and his character and about her last moments with her husband before he died. Woodward contends that Ashley’s testimony was improper victim-impact testimony that is prohibited during the guilt phase of a capital trial. Woodward did not raise this objection during Ashley’s testimony, and he acknowledges that this claim must be reviewed for plain error.
“ ‘Although the failure to object will not preclude [plain-error] review, it will weigh against any claim of prejudice.’ Sale v. State, 8 So.3d 330, 345 (Ala.Crim.App.2008). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
“The Alabama Supreme Court has held that victim-impact statements
“ ‘are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the . guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible. See C. Gamble, McElroy’s Alabama Evidence § 21.01 (4th ed.1991), citing, inter alia, Fincher v. State, 58 Ala. 215 (1877) (a fact that is incapable of affording any reasonable inference in reference to a material fact or inquiry involved in the issue cannot be given in evidence). If the statements are not material and relevant, they are not admissible.’
“Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993).
“‘[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.’ Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995). The Court in Ex parte Rieber also said:
“‘However, in Ex parie Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.’
“663 So.2d at 1005.
“First, much of Ashley’s testimony was not victim-impact evidence. She explained that Officer Houts was working overtime on the day he was shot; that he always telephoned her halfway through his shift but that he did not call her that day and she later found out that he had not called her because he had been shot; that she went to the hospital to be with him after he was shot and that he never regained consciousness; and that he died two days after he was shot. Ashley also identified an autopsy photograph of Officer Houts to identify him. The foregoing testimony was relevant to prove the circumstances leading up to the crime and to Officer Houts’s death days later, and it was relevant to identify Officer Houts as the victim of the shooting. That testimony was properly admitted. See, e.g., Stanley v. State, 143 So.3d 230 (Ala.Crim.App.2011).
*1161 “We agree with Woodward, however, that some of Ashley’s testimony was not relevant to any issue in the case and, therefore, was inadmissible. For example, the State elicited testimony that Ashley and Officer Houts met while they were both in the military and stationed overseas; that Officer Houts had recently purchased an exercise machine and that before he left for work on the morning he was shot he had joked with Ashley about her putting the machine together; and that Officer Houts donated plasma on a regular basis and that he and Ashley both had a policy to give of themselves to others. Although this testimony the State elicited from Ashley was irrelevant, having examined the record in its entirety, we conclude that the irrelevant portions of Ashley’s testimony did not operate to deny Woodward a fair trial or otherwise prejudice a substantial right of Woodward’s.
“The jury was instructed that it could not find Woodward guilty unless the State proved his guilt beyond a reasonable doubt. The jury was also instructed not to allow prejudice, sympathy, or emotion affect its verdict. We note, as the Alabama Supreme Court did in Ex parte Rieber:
“ ‘It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Woodward] did not receive a fair trial simply because the jurors were told what they probably had already suspected — that [Officer Houts] was not a “human island,” but a unique individual whose murder had inevitably had a profound impact on [his] children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).’
“663 So.2d at 1006.
“Although some of Ashley’s testimony was irrelevant, we find that it did not affect the outcome of the trial, that it did not prejudice Woodward’s substantial rights, and that allowing it did not rise to the level of plain error. Woodward is due no relief on this claim.”
123 So.3d at 1022.
In the present case, we find that Burk’s father’s testimony concerning his identification of Burk at East Alabama Medical Center, his testimony identifying Burk in the photograph, and the photograph itself was not victim-impact evidence. That evidence was relevant to identify Burk as the victim of the shooting and, thus, was properly admitted.
We agree that Burk’s father’s comments characterizing his daughter were not relevant to any material issue in the guilt phase. However, having examined the entire record, we conclude that this testimony did not operate to deny Lockhart of a fair trial or otherwise prejudice a substantial right of Lockhart’s. Like the jury in Woodward, the jury in the present case was instructed that the State must prove each element of the offense beyond a reasonable doubt and that “sympathy or emotion are not elements of evidence and must not be allowed to influence you in the consideration of the evidence.” (R. 4322-24.) We find that Burk’s father’s comments characterizing his daughter did not affect the outcome of the trial, that they did not prejudice Lockhart’s substantial rights, and that allowing the comments did not rise to the level of plain error. Therefore, Lockhart is due no relief on this claim.
*1162 Lockhart also argues that the trial court erred when it allowed two comments about Burk by the prosecutor during closing argument. Specifically, Lockhart argues that, during closing argument to the jury, the prosecutor should not have been allowed to describe Burk as “[a] daughter, a sister, a Mend, and a student at Auburn University with a bright and promising future until her life was cut short by the Defendant, Courtney Lockhart,” or to ask the jury to, after it had considered all the evidence in the case, “come back here and speak for Lauren.” (R. 4244, 4317.) The defense did not object to these comments.
In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), during opening statements of the guilt phase of the trial, the prosecutor made comments describing the murder victim as “a young mother of two who’s running a neighborhood grocery, who’s a happy, caring person, who helps people in their community when they need a little credit or their power bill is due, who’s a good wife, working with her husband to make a place for her children.” 791 So.2d at 1012. During closing arguments, the prosecutor stated' that “this is [the victim’s] day in court, it’s the only day she’ll get. It’s as much her trial as it is [the defendant’s]. She’s not going to testify, she’s in the grave. That is, most of her is. She can’t testify from that stand.” Id. The prosecutor also suggested what the victim might say if she was able to testify. Id.
Considering whether those comments were improper, this Court stated:
“The standard for reviewing a prosecutor’s argument is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). ‘ “This court has concluded that the failure to object to improper prosecutorial arguments, [as is the case here,] ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” ’ Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Furthermore:
“ ‘ “In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).’
“Hutcherson v. State, 727 So.2d 846, 854-55 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999), quoting Bankhead v. State, 585 So.2d. 97, 106 (Ala.Cr.App.1989), aff'd in pertinent part, remanded on other grounds, 585 So.2d 112, 127 (Ala. *1163 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993).
“We do not find that the prosecutor’s comments, either alone or in conjunction with his other comments, were reversible error. The evidence of [the defendant’s] guilt — including his own confession to the crime — was compelling. The jury was properly instructed that it should base its verdict solely on the evidence in the case; that the statements and arguments of the attorneys were not to be considered as evidence; and that its verdict could not be based on sympathy, prejudice or emotion. ‘ “The jury 'is presumed to follow the instructions given by the trial court.” ’ Frazier v. State, 758 So.2d 577, 604 (Ala.Cr.App.1999), aff'd, 758 So.2d 611 (Ala.1999), quoting Hutcherson, supra, at 854. Viewed in the context of the entire trial, we do not believe that the prosecutor’s comments during opening or closing arguments about the victim affected the outcome of [the defendant’s] trial or otherwise prejudiced [the defendant]. Accordingly, we find no reversible error regarding this claim.”
Jackson v. State, 791 So.2d 979, 1012-13 (Ala.Crim.App.2000).
In the present case, we find that the trial court did not commit plain error by allowing the prosecutor’s comments about Burk. Again, the jury was instructed that “sympathy or emotion are not elements of evidence and must not be allowed to influence you in the consideration of the evidence.” (R. 4323-24.) The jury was also instructed that it should base its verdict solely on the evidence in the case and that the statements and arguments of the attorneys were not to be considered as evidence. (R. 4332-33.) We presume that the jury followed those instructions. Viewed in the context of the entire trial and considering that defense counsel did not object to- the prosecutor’s comments, we find that the prosecutor’s comments about the victim did not affect the outcome of Lockhart’s trial or otherwise prejudice Lockhart. Therefore, we find no reversible error concerning this claim.
XV.
Next, Lockhart contends that the prosecution improperly argued facts not in evidence during its closing argument in the guilt phase. Lockhart did not object to the prosecution’s statements; thus, we review this claim for plain error only. See Rule 45A, Ala. R.App. P.; Wilson, supra.
In Whatley v. State, 146 So.3d 437 (Ala.Crim.App.2010), this Court stated:
“ ‘ “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.” Ex parte Kennedy, 472 So.2d [1106,] at 1111 [(Ala.1985)].... “This court has concluded that the failure to object to improper prosecu-torial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).’
“Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, Kuenzel v. Alabama, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)(emphasis omitted).
“ ‘ “In judging a prosecutor’s closing argument, the standard is whether the • argument- ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ” *1164 Bankhead [v. State ], 585 So.2d [97,] 107 [(Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.” Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 [528] U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth ,and are not expected to become factors in the formation of the verdict.” Bankhead, 585 So.2d at 106. “Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.” Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.’
“Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), affirmed, 814 So.2d 970 (Ala.2001), cert. denied, Ferguson v. Alabama, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002). ‘ “During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.” ’ Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), cert. denied, Reeves v. Alabama, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), reversed on other grounds, Ex parte Rutledge, 523 So.2d 1118 (Ala.1988).”
146 So.3d at 492.
Lockhart first alleges that the prosecutor improperly argued that “because Highway 280 was too busy, Mr. Lockhart turned the car around once in order to shoot Ms. Burk in a secluded spot.” (Lockhart’s brief, at 113.) According to Lockhart, the prosecutor’s argument was improper because, Lockhart says, “[n]o evidence supported the prosecutor’s narrative that Highway 280 was too crowded or that Mr. Lockhart’s erratic driving showed a premeditated plan to kill.” Id.
During closing arguments, the prosecutor actually stated:
“[Lockhart] got wrong that [Burk] would try to talk herself — her way out of it. How? By being [Burk]. By offering to help him. By being [Burk]. And when she realized that wasn’t going to work — they had already gone all the way down 147, all the way to 280, too busy, too many people near that major highway. Turned around and are headed back the other way. It’s about to be over. She knew it. So what did she do? She-did all she could do. She did the one thing that — if you believe his version to that point, one thing that he picked her not to do, which was to bail. To bail. To flee. To move. Move those hands. Open that door. Jump out on to the pavement.”
(R. 4260-61.)
Viewing the prosecutor’s statement in context, it appears the prosecutor was offering a possible explanation for Burk’s decision to jump out of a moving vehicle. Contrary to Lockhart’s assertion, the prosecutor did not state that Lockhart’s deci *1165 sion to drive away from Highway 280 constituted evidence of his intent to kill Burk. There was evidence indicating that Lock-hart and Burk drove around for an extended period and that they drove in the area near Highway 280 before Burk jumped out of the vehicle on Highway 147. We find that the prosecutor’s statement constituted a permissible inference from the evidence. Moreover, the prosecutor’s statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process, nor did the statement rise to the level of plain error.
Next, Lockhart alleges that “the prosecutor told the jury that a five-pound trigger pull meant that the murder weapon was ‘extremely hard’ to fire, and the shooting was ‘no accidental discharge.’ ” (Lock-hart’s brief, at 113.) According to Lock-hart, there was no evidence to support an assertion that the handgun was hard to discharge.
While holding the handgun during closing arguments, the prosecutor stated:
“And I grant you, it’s not a good weapon. The trigger pull is extremely hard on both single action and double action. I submit to you that was no accidental discharge, for somebody that has been in combat that knows how to handle weapon.”
(R. 4305.)
The record indicates that a firearm expert testified that the handgun functioned properly and that it required approximately five pounds of pressure to pull the trigger to the rear when the hammer was cocked. She also testified that the handgun required approximately 12 pounds of pressure to pull the trigger to the rear when the hammer was not cocked. We find that the prosecutor’s statement was a reasonable impression of the evidence, which he had a right to present. Furthermore, the prosecutor’s statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process, nor did the statement rise to the level of plain error.
Lockhart also argues that the prosecutor improperly told the jury that Lockhart vomited during his videotaped statement because he was nervous. During closing arguments, the prosecutor stated:
“[W]hen you saw the video, what’s the first thing you saw? Courtney Lockhart is throwing up. Why? Because the Auburn detectives are there. He is nervous. He is upset and he is throwing up. The police didn’t do anything to make him throw up.”
(R. 4309.)
We have reviewed Lockhart’s videotaped statement to the police that was shown to the jury. At the very beginning of the video, Lockhart walks into a police interrogation room with some law-enforcement officers, and he vomits into a trash can. An officer asks Lockhart whether he needs some water. Detective Randy Armstrong tells Lockhart to take his time. Investigator Joe Herman asks Lockhart whether he is alright. Then, in response to another officer’s question concerning whether Lockhart was alright, Detective Armstrong states that Lockhart has “got some nerves, but he’ll be good.” Detective Armstrong tells Lockhart that he wants him to be comfortable. Lockhart is given a cup of water, and his handcuffs are removed. Detective Armstrong asks Lockhart whether he is getting better, and he responds that he is. Detective Armstrong then begins the interview and states that “we’re going to take our time and take it slow. I know you’re nervous. We’re nervous. We’re just going to get through it and do the best we can. I want you to be comfortable.”
*1166 Again, we find that the prosecutor’s statement concerning Lockhart’s nervousness was a reasonable inference from the evidence. Furthermore, the prosecutor’s statement did not so infect the trial with unfairness as to make the resulting conviction a denial of due process, nor did the statement rise to the level of plain error. Therefore, for the foregoing reasons, we find no reversible error in the prosecution’s closing arguments in the guilt phase.
XVI.
Next, Lockhart contends that the trial court failed to properly consider mitigating evidence. Specifically, Lockhart contends that “the trial court improperly minimized the importance of almost all mitigating evidence.” (Lockhart’s brief, at 116.) Lockhart cites four instances in the trial court’s sentencing order where the trial court considered a nonstatutory mitigating circumstance but then gave it “little weight.” (Lockhart’s brief, at 116-18; C. 1076-77.) Thus, Lockhart is not arguing that the trial court refused to consider mitigating evidence. Instead, Lockhart is arguing that the trial court failed to give the mitigating evidence the proper weight.
This Court has explained:
“ ‘ “A sentencer in a capital case may not refuse to consider or be ‘precluded from considering’ mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 71 L.Ed.2d 1, 102 S.Ct. 869, [874] (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 57 L.Ed.2d 973, 98 S.Ct. 2954, [2964-65] (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding the defendant’s character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).” ’ ”
Loggins v. State, 771 So.2d 1070, 1087 (Ala.Crim.App.1999) (quoting Arthur v. State, 711 So.2d 1031, 1091 (Ala.Crim.App.1996)).
In the trial court’s sentencing order in the present case, as Lockhart concedes, the trial court considered, among other things, the following four nonstatutory mitigating circumstances: (1) Lockhart is loved by his family and is a good father to his daughter; (2) Lockhart’s lack of relationship with his father and subsequent loss of Sergeant Prince, his father figure; (3) Lockhart’s military service; and (4) Lockhart has been a well-behaved inmate. (C. 1076-77.) However, the trial court assigned each of those mitigating circumstances “little weight,” and the court explained its reasons for doing so. That assignment of weight rested solely with the trial court. Therefore, contrary to Lockhart’s allegation, we find that the trial court did not err in its consideration of the mitigating circumstances and its assignment of weight to each one.
*1167 XVII.
Next, Lockhart argues that Ala-bama’s death-penalty statutes unconstitutionally allow for arbitrary imposition of the death penalty because, 'he says, the statutes allow the trial court to override the jury’s sentencing recommendation without “adequate safeguards to prevent arbitrary results.” (Lockhart’s brief, at 120.)
This Court has stated:
“Alabama’s death-penalty sentencing scheme has repeatedly withstood constitutional attacks.
“ ‘The appellant maintains that the jury override provision of Ala.Code 1975, § 13A-5-47(e), is unconstitutional. He claims that the statute contains no guidelines for the sentencing judge to follow and that the statute violates the Eighth Amendment, particularly in a case where, as here, the jury unanimously recommends a sentence of life imprisonment without parole.
“ ‘Sentencing by a jury is not constitutionally required. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Proffitt v. Florida, 428 U.S. 242, 251-52, 96 S.Ct. 2960, 2966-67, 49 L.Ed.2d 913 (1976), and § 13A-5-47(e) set “out a standard of review for jury override that meets constitutional requirements.” McMillian v. State, 594 So.2d 1253, 1272-73 (Ala.Cr.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). The argument that the jury override provision of § 13A-5-47(e) is constitutionally infirm because it allows for the “arbitrary and standardless” imposition of the sentence of death has been repeatedly rejected by the appellate courts of this state. See, e.g., Ex parte Jones, 456 So.2d 380, 381-83 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); McMillian v. State, 594 So.2d at 1272; Parker v. State, 587 So.2d 1072, 1098 (Ala.Cr.App.1991). See also Ex parte Giles, 632 So.2d 577 (Ala.1993) (holding that Ala. Const. § 11 “does not preclude judicial override of the jury’s sentencing recommendation in a .capital case”).
“ ‘The trial court’s sentencing order reflects the fact that the court gave “consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.” R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances,' determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury’s recommendation. Constitutional and statutory provisions require no more.’
“Carr v. State, 640 So.2d 1064, 1073-74 (Ala.Crim.App.1994).”
Doster, 72 So.3d at 104-105. Therefore, Lockhart is entitled to no relief on this claim.
XVIII.
Next, Lockhart argues that his death sentence was imposed in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and, thus, is unconstitutional. In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that the Constitution requires that any fact that increases the penalty for a crime above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring, the Court extended its holding in Apprendi to death-penalty cases.
Lockhart argues that determining, whether the aggravating circumstances *1168 outweigh the mitigating circumstances is a factual determination. Consequently, Lockhart argues that Ring invalidates Ala-bama’s capital-sentencing scheme because, he says, Ring requires that the jury, not the trial court, determine whether the aggravating circumstances outweigh the mitigating circumstances. (Lockhart’s brief, at 123); see also §§ 13A-5-46(e), 13A-5-47(e), and 13A-5-48, Ala.Code 1975. Lockhart further argues that, in overriding the jury’s sentencing recommendation in the present case, the trial court violated Ring because the court considered evidence unknown to the jury regarding his commission of other robberies around the time he killed Burk and, thus, that the jury did not make every factual determination.
As Lockhart appears to recognize, the arguments he raises were rejected by the Alabama Supreme Court in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). In Waldrop, concerning whether Ring requires that the jury, not the trial court, determine whether the aggravating circumstances outweigh the mitigating circumstances, the Supreme Court explained:
“[T]he weighing process is not a factual determination. In fact, the relative ‘weight’ of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, ‘While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.’ Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which ‘the sen-tencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.’ Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting ‘the notion that “a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required” ’ (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that ‘the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer’).
“Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum.
“In Ford v. Strickland, supra, the defendant claimed that ‘the crime of capital murder in Florida includes the element of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.’ Ford, 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit réjeeted this argument, holding that ‘aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer’s discretion in a structured way after guilt has been fixed.’ 696 F.2d at 818. Furthermore, in addressing the defendant’s claim that *1169 the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant’s argument
“ ‘seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.’
“696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit’s rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (‘while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party’); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
“Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
Waldrop, 859 So.2d at 1189-90.
Further, concerning whether Ring permits the trial court to make some factual determinations in addition to those made by the jury, the Supreme Court explained:
“Waldrop claims that the trial court’s determination that the murders were especially heinous, atrocious, or cruel as compared to other capital offenses — an aggravating circumstance under Ala. Code 1975, § 13A-5-49(8) — is a factual determination that under Ring must be made by the jury. However, Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment ... ’ or ‘ “expose[ ] [a defendant] to a greater punishment....’” Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became ‘exposed’ to, or eligible for, the death penalty. The trial court’s subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an ‘element’ of the offense.”
Waldrop, 859 So.2d at 1190.
Lockhart maintains that Waldrop was wrongly decided. However, “[t]his Court has no authority to overrule Alabama Supreme Court precedent.” Whatley v. State, 146 So.3d 437, 489 (Ala.Crim. *1170 App.2011) (opinion on return to remand) (citing § 12-3-16, Ala.Code 1975).
Therefore, based on the Alabama Supreme Court’s decision in Waldrop, we find no merit in Lockhart’s contention that his sentence was imposed in violation of Ring. Furthermore, because Lockhart was convicted of murdering Burk during a robbery in the first degree, the jury’s verdict at the guilt phase established the existence of an aggravating circumstance, ,§ 13A-5-49(4), Ala.Code 1975, thereby making Lockhart eligible for the death penalty.[9] Under Waldrop, Lockhart’s sentence does not violate Ring; thus, contrary to Lockhart’s contention, his sentence is not unconstitutional. .
XIX.
Next, Lockhart argues that death-qualifying the jury to determine the prospective jurors’ views on capital punishment resulted in a conviction-prone jury and violated his constitutional right to an impartial jury.
“ ‘In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from “death qualification” of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).’ ”
Lee v. State, 44 So.3d 1145, 1161-62 (Ala.Crim.App.2009) (quoting Sockwell v. State, 675 So.2d 4, 18 (Ala.Crim.App.1993)).
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995) (footnote omitted).
Therefore, in the present case, the trial court committed no error in allowing the prospective jurors to be questioned concerning their views on capital punishment.
XX.
Next, Lockhart argues that the trial court erred in “double counting” robbery as both an element of the capital offense in the guilt phase of the trial and as an aggravating circumstance in the penalty phase of the trial.
This Court has previously stated:
“Contrary to [the defendant’s] assertions, there is no constitutional or statutory prohibition against double counting *1171 certain circumstances as both an element of the offense and an aggravating circumstance. See § 18A-5-45(e), Ala.Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily required, [the defendant] is not entitled to any relief on this issue. § 13A-5-45(e), Ala.Code 1975.”
Vanpelt v. State, 74 So.3d 32, 89 (Ala.Crim.App.2009).
Likewise, in the present case, Lockhart is not entitled to any relief on this issue.
XXI.
Finally, Lockhart argues that evolving standards of decency have rendered Alabama’s method of execution— lethal injection — unconstitutional. Lock-hart makes a bare allegation that “Ala-bama’s undeveloped and undisclosed procedures for administering lethal injection pose a substantial risk of inflicting unnecessary pain and therefore violate evolving standards of decency.” (Lockhart’s brief, at 129.)
This Court has stated:
“Effective July 1, 2002, Alabama’s primary method of execution is lethal injection involving a three-drug protocol. Section 15-18-82.1(a), Ala.Code 1975. Section 15-18-82.1 (c), Ala.Code 1975, provides: ‘A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.’ Section 15—18—82.1(h), Ala.Code 1975, also provides: ‘In any case in which an execution method-is declared unconstitutional the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.’
“The constitutionality of Alabama’s method of execution has been addressed by the United States Supreme Court and the Alabama Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“ ‘The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [170 L.Ed.2d 420 (2008)], and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.” Baze, [553 U.S. at 61], 128 S.Ct. at *1172 1587. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.” Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Ala-bama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’
“11 So.3d at 339.”
Thompson v. State, 153 So.3d 84, 180 (Ala.Crim.App.2012) (footnote omitted). •
Therefore, Alabama’s method of execution is not unconstitutional, and Lockhart is hot entitled to any relief on this claim.
XXII.
As required by § 13A-5-53, Ala. Code 1975, we must address the propriety of Lockhart’s death sentence. Lockhart was indicted for, and convicted of, murdering Burk during a robbery in the first degree, an offense defined as capital by § 13A-5-40(a)(2), Ala.Code 1975. The jury unanimously recommended that Lock-hart be sentenced to life in prison without the possibility of parole. However, the trial coui't did not follow the jury’s recommendation and sentenced Lockhart to death.
The record reflects that Lockhart’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found as aggravating circumstances that the capital offense was committed while Lockhart was engaged in a robbery and a kidnapping, aggravating circumstances as defined in § 13A-5-49(4), Ala.Code 1975. As statutory mitigating circumstances, the trial court found that Lockhart has no significant history of prior criminal activity and that the offense was committed while Lockhart was under the influence of extreme mental or emotional disturbance. The trial court found the following nonstatutory mitigating circumstances: Lockhart is loved by his family and is a good father to his daughter; Lockhart’s lack of relationship with his father and subsequent loss of Sergeant Prince, his father figure; Lockhart’s military service; and Lockhart has been a well-behaved inmate. The trial court also considered the jury’s sentencing recommendation as a mitigating circumstance. The trial court found that the aggravating circumstances outweighed the mitigating circumstances and that a death sentence was warranted.
We have independently weighed the aggravating and the mitigating circumstances as required by § 13A-5-53(b)(2), *1173 Ala.Code 1975, and are convinced, as was the trial court, that death is the appropriate sentence for the murder that Lockhart committed.
Pursuant to § 13A-5-53(b)(3), Ala.Code 1975, we determine that Lockhart’s sentence is neither disproportionate nor excessive to the penalty imposed in similar cases. ‘“In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.’ ” Doster, 72 So.3d at 122 (quoting McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999)). See also Flowers v. State, 922 So.2d 938, 961 (Ala.Crim.App.2005) (kidnapping/murder).
Lastly, as required by Rule 45A, Ala. R.App. P., we have searched the record for any error that has or probably has adversely affected Lockhart’s substantial rights and have found no plain error or defect in the proceedings under review.

Conclusion

For the foregoing reasons, Lockhart’s conviction for murder made capital because it was committed during a robbery and his sentence of death are affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, J., concur. KELLUM, J., concurs in the result. JOINER, J., concurs in part; dissents in part, with opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Holman Correctional Facility is located near Atmore, Alabama.

. We are using initials to protect the anonymity of the prospective jurors.

. We note that it cannot reasonably be said, and Lockhart does not argue, that his reference to an attorney was an unequivocal request for counsel. Lockhart’s inquiry was at best an equivocal reference to his right to counsel.

. The Sixth Amendment to the United States Constitution provides, in part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” The Confrontation Clause in the Sixth Amendment has been found to be applicable to the States through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

. As he asserted with respect to the issue addressed in Part III, supra, Lockhart continues to state that references to the prior bad acts that he committed while in the military are included in the video recording of his police interview that was marked as State’s Exhibit 80 and was played for the jury at trial. However, again, this Court finds that State’s Exhibit 80 does not contain any audible reference to the prior bad acts committed by Lock-hart while he was in the military.

" 20 Ala.Code § 15-23-74 (1975) states, ‘The victim has the right to present evidence, an impact statement, or information that concerns the criminal offense or the sentence during any pre-sentencing, sentencing, or restitution proceeding.’ The prosecution stated that its purpose in calling the family members at the sentencing hearing was to distinguish this case from Carroll. The Court will consider their unsworn statements only to show that the family opposed leniency.”

. Earlier in her testimony, Richert explained that a single action trigger pull occurs when the hammer of the firearm is cocked before the trigger is pulled and that a double action trigger pull occurs when the hammer is not cocked before the trigger is pulled.

. Lockhart actually sets forth the chain of custody of the firearm in a footnote in his brief as follows: "The gun was found by Sgt. Greg Lahr who never opened the weapon (R.. 3829-30), given to Ray Smith who did not open the box,containing the gun (R. 3975-77), and passed to Ms. Richert (R. 4037). She then gave the gun to Detective Randy Armstrong who testified that the gun was sealed until trial. (R. 4024.)” (Lockhart's brief, at 106 n.30.)

. We note that, during the penalty phase, the jury also unanimously found that the State had proven beyond a reasonable doubt that the capital offense was committed while Lockhart was engaged in a kidnapping; thus, the jury found the existence of two aggravating circumstances making Lockhart eligible for the death penalty. See § 13A-5-49(4), Ala.Code 1975.